**ROLLINS CABLEVUE, INC., Plaintiff,**

**v.**

**SAIENNI ENTERPRISES, a Delaware partnership, Defendant.**

Civ. A. No. 86–139–JRR.

United States District Court,
D. Delaware.

May 2, 1986.

Jeffrey S. Goddess of Saul, Ewing, Remick & Saul, Wilmington, Del., for plaintiff; Thomas A. Rouse of Byrne, Slater, Sandler, Shulman & Rouse, P.C., Hartford, Conn., of counsel.

Anthony A. Figliola, Jr., Wilmington, Del., for defendant.

ROTH, District Judge.

Plaintiff, Rollins Cablevue, Inc., (hereinafter "Rollins") has filed a verified complaint, seeking declaratory and injunctive relief against Saienni Enterprises and Clayton Cable, Inc. Plaintiff seeks to enjoin defendants from constructing and operating a Satellite Master Antenna Television system (SMATV) which allegedly violates the Cable Communications Policy Act (hereinafter "Cable Act"), 47 U.S.C. § 521 *et seq.*, and the Delaware Regulation of Cable Television Systems, 26 *Del.C.* § 601 *et seq.* Plaintiff also seeks a declaration that it has a contractual right to maintain and operate its cable television wires, lines and equipment, as presently installed at Beaver Brook Apartments, a multiple unit dwelling owned by defendant Saienni Enterprises. In addition, plaintiff asks that defendants be enjoined from destroying, tampering or

otherwise interfering with Rollins' cable television wires, lines and equipment.

Plaintiff first sought a temporary restraining order which was denied by the Court on March 28, 1986. The Court at that time questioned the existence of a private right of action in a cable operator to contest the propriety of another cable operator's cable system. The Court also expressed doubt that the plaintiff itself would suffer irreparable injury that could not be remedied by money damages.

A hearing on a preliminary injunction was held on April 25, 1986, at which time the question of a private right of action was again considered. The Court at that time ruled that the Cable Act did not provide Rollins with a private right of action in this forum to seek a declaration that Clayton Cable was in violation of the Cable Act or of the Delaware Regulatory Act. For this reason the Court refused to grant Rollins' petition to enjoin defendants from constructing a cable television system using public rights of way at the Beaver Brook Apartment complex. The Court did, however, rule that it had jurisdiction under the Cable Act to determine whether Rollins had a right of access to the Apartments to operate its cable equipment presently installed there. The Court also retained jurisdiction of Rollins' state law claim for breach of contract by Saienni Enterprises.

With no claim now being asserted against Clayton Cable by plaintiff, Clayton was dismissed from the case. The Court then held a hearing on Rollins' petition for a preliminary injunction to restrain Saienni Enterprises from cutting, damaging, disabling, destroying or in any way tampering or interfering with any line, cable or equipment owned or used by Rollins to provide cable television service to the residents of the Beaver Brook Apartment Complex.

On the basis of the verified complaint, the affidavits submitted and the presentations of the parties at the April 25 hearing, the Court makes the following findings of fact:

Construction of the Beaver Brook Apartments began about 1969. During 1970, Rollins undertook construction of a Master Antenna television system for the Beaver Brook Apartment Complex. At the time that Rollins installed hook-ups to the master antenna, it also installed a cable television system. Cable television was not yet available in the area. However, Rollins installed the Master Antenna system and agreed to maintain it in return for defendant Saienni Enterprises agreeing to permit Rollins to install a cable system to which the residents could hook-up when that service became available.

Rollins claims that, as a condition of its installing the Master Antenna and cable TV systems, it signed an agreement with Saienni Enterprises under which Rollins was legally entitled to maintain and operate the wires, cables and equipment it had installed at Beaver Brook for an initial term of 20 years and continuously thereafter at Rollins' option under successive ten year renewals as long as any resident of the Beaver Brook Apartments desired to receive Rollins cable television services.

Rollins claims that the agreement was signed about 1970 or 1971. Thomas Byrd, who was at that time the General Manager of the Wilmington System for Rollins, testified that he signed the agreement for Rollins. He cannot recall who signed for Saienni Enterprises. Byrd has correspondence in his files referring to the agreement. However, a search of Rollins' files has failed to turn up a copy of it. Byrd also testified that he is familiar with the standard types of contracts Rollins would enter into at that time and that in a contract such as the one reached with Saienni Enterprises, Rollins would install and maintain a Master Antenna system in a multiple dwelling unit complex in return for the right to also install a cable facility. Such a contract would run routinely for 20 years because franchises ran for 20 years and the agreement would parallel the franchise.

Defendant Saienni Enterprises denies any such agreement with Rollins. However, David Rash, who now manages the Beaver Brook Apartments for Saienni Enterprises and who in 1970 was Maintenance

Superintendant at Beaver Brook, although he presently has no copy of any such agreement with Rollins, cannot say that there was not an agreement. Rash has records for the apartments only from 1974 on. Elmer Saienni, a general partner in Saienni Enterprises, states in his Affidavit that Rollins agreed to install a Master Antenna system, which would become the sole property of Beaver Brook Apartments, in return for being given the right to put in a cable system there. Elmer Saienni denies granting an exclusive or life time easement to Rollins.

David Rash, not being satisfied with the quality of service being provided by Rollins at Beaver Brook, began in 1985 to look for another provider of cable television service. He discussed with defendant Clayton Cable what service could be provided by it. Clayton Cable, as an SMATV, picks up signals by a satellite antenna located nearby at a single unit housing development, Beaver Brook Crest. Clayton Cable is prepared to provide cable TV service to the Beaver Brook Apartments from its Beaver Brook Crest headend or from a headend located on the Beaver Brook Apartments premises. On January 23, 1986, Clayton Cable signed a contract with Saienni Enterprises to provide exclusive cable TV services to the Beaver Brook Apartments. In return Saienni Enterprises will receive a licensee fee based on 10 percent of the gross revenues of Clayton Cable.

Clayton Cable is in the process of installing its cables through the Beaver Brook Apartment Complex. Some of these cables run within the public right of way along Saienni Boulevard. In order to reach Beaver Brook Buildings One through Five, Clayton Cable will also transmit signals across Mendell Place, a public road, by infra-red micro-waves.

### PRIVATE RIGHT OF ACTION

■ The first ruling that the Court has made is that Rollins, as a cable system operator, does not have a private right of action under the Cable Act to seek to enjoin defendants from constructing and operating an SMATV at Beaver Brook Apartments on the ground that the Clayton Cable system will violate the Cable Act.

From the facts of record in this case, it would appear that under the provisions of the Cable Act the Clayton Cable system requires a franchise and that Clayton does not have one. Section 602 of the Cable Act, 47 U.S.C. § 522, defines a "cable operator" as a person or company that provides cable service over a cable system. "Cable system" is defined as a set of closed transmission paths designed to provide cable service, including video programming, to multiple subscribers in a community. Exclusions from this definition include § 602(6)(B) "a facility that services only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management, unless such facility or facilities uses any public right-of-way." Section 621 of Cable Act, 47 U.S.C. § 541(b) provides that a cable operator may not provide cable service without a franchise. Cable operators in Delaware are franchised under 26 *Del.C.* § 601.

From the evidence adduced at the April 25 hearing, it would appear that the Clayton cable, as installed to date, lies in part within the public right-of-way of Saienni Boulevard The transmission of signals across Mendell Place by infra-red microwave will also cross a public right-of-way. Clayton Cable, as it will operate at the Beaver Brook Apartments, will, therefore, be a "cable operator," under the Cable Act, required to obtain a franchise from the Delaware Public Service Commission.[1]

There is no provision in the Cable Act, creating a private remedy for a franchised cable operator to enjoin unfranchised cable systems. To determine whether such a private right of action, although not expressed in the Cable Act, is implicit in it, we must review the four factors articulated

---

1. If the cable system intrudes into interstate commerce to the extent that it comes under the regulatory scope of the Cable Act, it would seem immaterial whether that intrusion was by cable or micro-wave.

by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975):

1) Is the plaintiff one of the class for whose especial benefit the statute was enacted.

2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one.

3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff.

4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law.

To determine the significance of these factors in the Cable Act, it is helpful to review its legislative history. The House of Representatives Report states in regard to the purpose of the Cable Act that it:

[E]stablishes a national policy that clarifies the current system of local, state and Federal regulation of cable television. This policy continues reliance on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through a franchise process. The bill establishes franchise procedures and standards to encourage the growth and development of cable systems, and assure that cable systems are responsive to the needs and interests of the local communities they serve.

H.R.Rep. No. 934, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4656.

In addition to authorizing local government to regulate cable television, the more specific purposes of the Cable Act, as set forth in the House Report, include procedures and standards to protect cable operators in the renewal of a cable franchise; the setting aside of channels for commercial leased access use; restrictions on the ownership of cable systems; a requirement that lower income areas not be deprived of cable service; and an assurance of equal employment opportunity programs. *Id.* at 20, 4657.

The statement of purpose concludes:

In adopting this legislation, the Committee has endeavored to create an environment in which cable will flourish, providing all Americans with access to a technology that will become an increasingly important part of our national communications network.

*Ibid.* A further statement of purpose in the House Report is that:

The Committee intends that the franchise procedures and standards set forth in the bill will encourage the growth and development of cable systems, and will assure that cable systems are responsive to the needs and interests of the local communities they serve. The policies established in the legislation are also intended to assure that cable systems provide the widest possible diversity of information services and sources to the public.

*Id.* at 40, 4677.

The above statements of legislative intent demonstrate two predominant objectives of the Cable Act: 1) to make the local franchising process the primary means of cable television regulation, and 2) to insure that the public receives the widest possible diversity of information services and sources, in a manner which is responsive to the needs and interests of the local communities. *Housatonic Cable Vision v. Dept. of Public Utility*, 622 F.Supp. 798, 811 (D.Conn.1985).

A review of the language of the Cable Act itself reveals two major areas of federal regulatory concern: establishing requirements for diversity of information sources in Part II of the Act and standards for modification and renewal of franchises in Part III. Assuring diversity of information sources includes permitting a franchising authority to designate a portion of channel capacity for public, educational or governmental use, Section 611, 47 U.S.C. § 531, and requiring that a cable operator desig-

nate a certain percentage of channel capacity for commercial use by persons unaffiliated with the operator, Section 612, 47 U.S.C. § 532.

In Section 612, 47 U.S.C. § 532, there is a specified right of action for any person, aggrieved by the refusal of a cable operator to make commercial channel capacity available, to bring suit in the Federal district court to compel that such capacity be made available. The House Report speaks on the reason for the choice of the Federal district court as the forum to provide this remedy:

> The Committee is cognizant of the concerns which have been raised regarding the possibility that obtaining relief in Federal courts might be a slow process and this might substantially undermine the financial viability of programming services which cannot afford to incur serious delays in distributing their services to the public. The Committee believes that the leased access rights created by this section will be significantly furthered by the development of Federal case law precedent which will help provide direction and guidance as experience under these provisions grows. The Committee expects that the Federal courts will be able to resolve claims brought pursuant to this section on an expedited basis, and that the courts will utilize their ability to minimize any adverse impact on programmers that delay in the resolution of a judicial action under this section might otherwise cause.

H.R.Rep. 934 at 52, 1984 U.S.Code Cong & Admin.News at 4689.

Thus, we can see, in this vital area of Congress's concern, diversity of information sources available to the public, a federal forum is designated to permit a consistency in the decisions reached.

Turning to Part III of the Cable Act, Section 625, 47 U.S.C. § 545, permits modification of franchise obligations, including requirements for public, educational and government access, under certain described circumstances. Section 626, 47 U.S.C. § 546, sets procedures and standards for renewal of franchises. Congress's purpose in doing this was to establish a process which protects the cable operator against an unfair denial of renewal by the franchising authority. *Id.* at 72, 4709.

> It is intended that a cable operator whose past performance and proposal for future performance meet the standards established by this section be granted renewal.

*Ibid.*

There is specified in the Cable Act a right in any cable operator, adversely affected by a final decision made by a franchising authority on modification or renewal, to bring an action either in a Federal district court or in a state court. Section 635, 47 U.S.C. § 555. Therefore, once again, in an area of the Cable Act, designed to promote specified purposes of the Act, a right of action in federal court is expressly created.

We note also that the Cable Act is an amendment of the Communications Act of 1934. Traditionally, courts have ruled that the Communications Act did not create private rights of action:

> It is well established that "[t]he Communications Act ... did not create new private rights." *Scripps-Howard Radio, Inc. v. Federal Communications Commission,* 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942). Rather, "[t]he focus of the Communications Act is the general public, with the FCC, not the private litigant, as its champion." *Lechtner v. Brownyard,* 679 F.2d 322, 327 (3d Cir.1982). In order to insure that the FCC, through its discretion and expertise, will be able to foster beneficial and proper interpretations and applications of the Communications Act, *see Federal Communications Commission v. Pottsville Broadcasting Co.,* 309 U.S. 134, 139, 60 S.Ct. 437, 440, 84 L.Ed. 656 (1940); *Massachusetts Universalist Convention v. Hildreth & Rogers Co.,* 183 F.2d 497 (1st Cir.1950), the Act is generally viewed as not having created implied private rights of action, either for damages, *e.g., Lechtner v. Brownyard, su-*

*pra; Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir.1981), *cert. denied* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982); *Belluso v. Turner Communications Corp.,* 633 F.2d 393 (5th Cir.1980), or for injunctive relief, see *Schnapper v. Foley, supra; Comtronics, Inc. v. Puerto Rico Telephone Co.;* 409 F.Supp. 800 (D.P.R. 1975) *aff'd on other grounds,* 533 F.2d 701 (1st Cir.1977).

*New England Tel & Tel Co. v. Public Utilities Com'n of Maine,* 565 F.Supp. 949, 955–56 (D.Me.1983).

As the FCC is seen as the interpreter of the Communications Act of 1934 so it would seem, except in specially designated areas, that the local franchising authorities are intended to be the regulators and enforcers of the Cable Act. It is significant also that in the amendment of the Communications Act, an act which did not create private rights of action, Congress, in enacting the Cable Act, specified Federal court remedies only in limited areas.

From the above examination of the Cable Act and its legislative history, reviewing the Act in light of the four factors set out by the Supreme Court in *Cort v. Ash, supra,* we find no intent, express or implicit, to create a private right of action in a cable operator, such as Rollins, to enjoin the construction and operation of an allegedly unfranchised rival cable system. For this reason, we have dismissed Clayton Cable as a defendant and have denied Rollins' claim against Saienni insofar as it sought to enjoin Saienni from permitting construction or operation of the Clayton Cable system at Beaver Brook Apartments.

## RIGHT OF ACCESS

■ Plaintiff Rollins seeks to enjoin Saienni Enterprises from cutting, damaging, disabling, destroying or in any way tampering or interfering with any line, cable or equipment owned or used by Rollins to provide cable television service to the residents of Beaver Brook Apartment Complex. Rollins claims that under the provisions of the Cable Act it, as a franchised cable operator, has a right of access to the residents in a multiple unit dwelling, such as the Beaver Brook Apartments.

Defendant Clayton Cable argued, in support of its motion to dismiss the claim against it, that the provision in the House Version of the Cable Act, which granted cable companies the right of access to apartment complexes, was deleted from the Senate version that was enacted. Therefore, Clayton contended that the Act cannot be construed to create an implied right of access. Rollins responded that the right of access in the deleted § 633 survives in § 621, 47 U.S.C. § 541, which provides that:

(2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure

(A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;

(B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and

(C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator.

Rollins argues that if the Cable Act is not interpreted to grant a right of access to apartment buildings, the result would be absurd because while a cable operator would be authorized to use compatible easements, that right would be meaningless if the operator could not connect its equipment with individual dwelling units in a complex.

Rollins argues that because the safety and appearance; cost of installation, operation and removal; and compensation of property owner provisions, which were originally in the deleted § 633, were transferred to and preserved in § 621(a)(2)(A)–(C), the right of access survived.

Certainly, valid arguments can be made to support both interpretations.

The language of the statute and its legislative history could be read to require that all property owners who have created easements for the use of utility companies, including owners of multi-unit buildings and mobile home parks, must permit the local cable operator access to those easements. When the section discusses easements, it refers to property owners, not merely public rights-of-way.

There is an alternative view to the section on easements. Arguably it only grants a right to use property outside the building, with no corresponding right for the cable operator to enter a building unless the property owner consents. Since this section has co-existed with the section in the original House bill that had granted access to buildings, the two sections must have meant different rights of access.

There are two answers to the latter interpretation limiting the scope of "easements." First, the Act itself contains no such limitation on the right. Second, the right of access under the Act differs from the right to buildings under the House Bill. The House Bill would have permitted cable operators access to all buildings and mobile home parks. In contrast, the Act only permits access if the easement is "dedicated for compatible uses." Accordingly, a cable operator can only gain access to a building through an easement if there is room left by the preexisting user.

Meyerson, *The Cable Communications Policy Act of 1984: A Balancing Act on the Coaxial Wires*, 19 Ga.L.Rev. 543, 611–12 (1985).

In resolving the question of the right of access, the law of the state in which the cable system is located may be significant. There are states which have passed laws to require landlords to permit cable operators to wire a multiple unit dwelling. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). *Princeton Cablevision, Inc. v. Union Valley Corp.*, 195 N.J.Super. 257, 478 A.2d 1234 (N.J.Ch.1983). The provisions for compensation of the owner of the property for any damage caused by the installation of the cable system under 47 U.S.C. § 541(a)(2)(C) would seem to validate any such state required right of access. *Loretto v. Teleprompter Manhattan CATV Corp., supra. Princeton Cablevision Inc. v. Union Valley Corp., supra.*

The Delaware statute, franchising cable television systems, does not expressly state that every cable operator has a right of access to multiple unit dwellings. The language of the statute does provide, however, that:

Any franchisee may acquire an easement across, in or on public or private lands or waterways in this State which already have thereon or therein poles, wires, conduits, pipes, cables or other such facilities owned or maintained by a public utility, for the purpose of erecting, constructing, maintaining or operating any facilities to provide cable television or communications service to the public, including poles, wires, cables, guides, conduits and apparatus, which can be installed in the same manner, above or below ground, as the public utility facilities already on or in the property, by a taking in accordance with Chapter 61 of Title 10 which provides a method of fixing fair compensation if the easement should impose any additional burden on the property interest of the utilities or any other concern or person.

26 *Del.C.* § 613.

Chapter 61 of Title 10 of the Delaware Code provides for condemnation under power of eminent domain which may be

exercised by any authority, governmental or otherwise.

Section 613, therefore, provides that *any* franchised cable operator may acquire the right of eminent domain over private property, which already has a utility easement, to erect, construct, maintain or operate any facilities to provide cable television service to the public. These facilities must be installed in the same manner, above or below the ground, as the public utility facility already there, but by the language of § 613, construction for such cable television facilities can include its own poles, wires, cables, guides, conduits and apparatus.[2] If the cable television easement imposes any burden on the property owner of an apartment complex, § 613 provides for fair compensation through condemnation under eminent domain proceedings.

The language of § 613 clearly gives franchised cable system operators the right of access to multiple dwelling units which are already served by utility easements. It is impossible to conceive of a multiple dwelling complex in Delaware that would not be served by electric, telephone and, most probably, water and sewer easements.

The facts of record demonstrate that the Beaver Brook Apartments are served by water, telephone and electric easements. It would seem likely that Rollins will be able to prevail in its claim of right of access, under the provisions of the Cable Act and the Delaware Regulation of Cable Television Systems Act, 26 *Del.C.* § 601 *et seq.*, which creates a franchising authority pursuant to 47 U.S.C. § 522(9). Section 613 is compatible with the provisions of the Cable Act requiring just compensation for a property owner affected by a cable television easement; § 613 gives a right of access, through easement, to any franchised cable operator.

▮ The question remains then whether Rollins is entitled to a preliminary injunction, directing Saienni Enterprises not to tamper or interfere with Rollins cable equipment. We continue to be of the opinion that Rollins can obtain an adequate remedy for any harm to its equipment or interruption of its services through money damages. There is, however, another factor to consider. Rollins has 340 subscribers to its cable service at Beaver Brook Apartments. Clayton Cable has not yet completed its installation of its cable system. Moreover, it appears from the record that under Section 602 of the Cable Act, 47 U.S.C. § 522(6)(B), Clayton Cable is required to obtain a franchise before it can provide cable service under the provisions of Section 621, 47 U.S.C. § 541(b)(1).

If the Rollins cable hook-up should be removed at this time, the Rollins subscribers would find themselves without cable service until the Clayton Cable system is started up, and perhaps longer in view of the fact that Clayton Cable has not yet obtained the franchise which it apparently requires. Balancing the factors involved, and particularly taking into account the harm that will result to the present cable television subscribers if the Rollins equipment is disconnected, along with our opinion that Rollins will prevail on the right of access question, we will grant the preliminary injunction, prohibiting Saienni Enterprises from cutting, damaging, disabling, destroying or in any way tampering or interfering with any line, cable or equipment owned or used by Rollins to provide cable television service to the residents of the Beaver Brook Apartment Complex. *Eli Lilly and Co. v. Premo Pharmaceutical Labs*, 630 F.2d 120, 137 (3d Cir.1980), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

In view of the impact this preliminary injunction may have on the service proposed by Clayton Cable, the Court will proceed expeditiously to hold a trial on the merits of Rollins' claims of right of access

---

**2.** Section 613 creates a greater right of access than the Cable Act, as interpreted in the Meyerson article, 19 Ga.L.Rev. at 611, in that § 613 permits construction of the cable television system's own poles, wires and conduits, rather than granting access only if there is room in the easement left by the preexisting user.

1323

under the Cable Act and of the pendent state law claim of breach of contract.