MUNICIPIO DE TRUJILLO ALTO, demandante y recurrido, v. CABLE TV OF GREATER SAN JUAN, demandados y recurrentes.

Número: RE-90-556          Resuelto: 17 de marzo de 1993

*Edwin Quiñones*, abogado del recurrente; *Irma Iris García* y *Manuel Colón Lebrón*, abogados del recurrido.

El Juez Asociado Señor Alonso Alonso emitió la opinión del Tribunal.

El recurso ante nuestra consideración plantea la interrogante de si bajo las disposiciones de la Ley de Patentes Municipales, Ley Núm. 113 de 10 de julio de 1974 (21 L.P.R.A. sec. 651 *et seq.*),[1] la recurrente, Cable TV of Greater San Juan viene obligada a pagar patentes por el total de su volumen de negocios solamente al Municipio de San Juan, donde mantiene *sus únicas oficinas,* o si, por el contrario, le corresponde pagar patentes a prorrata según el volumen de negocios que genera en cada municipio *en los cuales brinda servicio.* Resolvemos que el pago de patentes por el volumen total de negocios corresponde al municipio donde mantiene oficinas la recurrente y no a prorrata. Así lo dispuso expresamente el legislador.

I

El 3 de febrero de 1988 el Municipio de Trujillo Alto presentó una demanda contra Cable TV of Greater San Juan (Cable TV) en la que reclamó la cantidad de $14,715 por concepto de patentes municipales no pagadas correspondientes a los años 1985–1988. La demandada se negó a

---

[1] Recientemente esta ley fue extensamente enmendada mediante la Ley Núm. 93 de 17 de noviembre de 1992. Por no ser de aplicación al caso de autos, no entramos a considerar tales enmiendas.

satisfacer la suma reclamada. Alegó que su compañía sólo mantenía oficina y almacén en el Municipio de San Juan.

Tras el cumplimiento de varios trámites procesales, *las partes estipularon los hechos* y solicitaron del tribunal que resolviera la controversia respecto a si procedía el pago a la demandante por la cantidad correspondiente al volumen de negocio de la demandada dentro de ese municipio. A esos efectos, el foro de instancia emitió una Sentencia Parcial mediante la cual resolvió que procedía el pago de patentes requerido por el Municipio de Trujillo Alto. Determinó que un análisis integral de la Ley de Patentes Municipales y de los hechos del caso reflejan que Cable TV hace operaciones de su negocio dentro del Municipio de Trujillo Alto, ya que instala sus cables en los postes de la Autoridad de Energía Eléctrica que se encuentran en el municipio, utiliza tramos de las vías públicas, realiza la venta del servicio a los usuarios dentro del municipio e instala allí los servicios y presta los correspondientes servicios de reparación, por lo cual, estaba obligada a pagar patentes municipales a dicho municipio.

De dicha sentencia acude la parte demandada y hace los señalamientos de error siguientes:

El Tribunal de Instancia erró al concluir que la Demandante Recurrida, Municipio de Trujillo Alto le corresponde, a tenor con la Ley de Patentes Municipales, Ley Núm. 113 del 10 de junio de 1974, 21 L.P.R.A., Sección 651, et se[q].) el Cobro de Patentes Municipales por el servicio de Cable T.V. (servicio de comunicaciones) que se ofrece en dicho Municipio.

Erró dicho Tribunal de Instancia al totalmente descartar la letra de la propia ley de Patentes Municipales que contempla un trato específico, al tratarse de un servicio de comunicaciones, tal y como es el servicio de la Demandada-Recurrente, al determinar la imposición de dichas Patentes Municipales. Solicitud de revisión, pág. 6.

Decidimos revisar. Habiendo comparecido las partes, procedemos a resolver.

## II

Impugna la parte recurrida nuestra jurisdicción para entender en el presente recurso. En síntesis, alega que la parte demandada no tiene derecho a litigar o a alegar en torno a la acción incoada por el Municipio en cobro de dinero por la patente municipal, por haber incumplido con los procedimientos establecidos en la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651(o), que requieren del cliente el pago o prestación de fianza como requisito jurisdiccional para acudir al Tribunal Superior o a este Foro. Se equivoca.

Los procedimientos estatuidos en la ley se refieren a casos de deficiencias([2]) en el pago de patentes. Las mismas resultan inaplicables al caso ante nos. *La recurrente no cuestiona el monto de las patentes a ser pagadas sino la procedencia en derecho de la autoridad del municipio de reclamar pago alguno por su parte. Así lo estipularon las partes al someter la controversia ante el Tribunal Superior como una exclusivamente de derecho.* Las propias disposiciones de ley citadas por la recurrida se refieren a la existencia de una controversia respecto "a la patente impuesta *por autorización* de las secciones 651 a 652y" del estatuto. Al *estar en controversia precisamente la autoridad legal de la recurrida para reclamar el pago* (de la cual carece según aquí resolvemos) *y no el monto o cómputo de una patente*

---

([2]) La propia ley define una deficiencia como el monto por el cual la patente *que se autoriza a imponer y cobrar* excede la suma de (a) la cantidad declarada como patente por la persona en su declaración, si dicha persona rindió una declaración y declaró en la misma alguna cantidad como patente, más (b) las cantidades previamente tasadas, o cobradas sin tasación como deficiencia; menos, el monto de aquellas reducciones, créditos, reintegros u otros reembolsos, que se hagan por razón de que la patente *que autoriza a imponer* 21 L.P.R.A. secs. 651a y 652 sea menor que el exceso de la cantidad especificada en la declaración, sobre el monto de reducciones previamente hechas. Véase 21 L.P.R.A. sec. 651 n.

*autorizada por ley*, no son aplicables las disposiciones de ley citadas por la recurrida. 21 L.P.R.A. sec. 651o(a)(1) y (10).

Siendo esto así, resolvemos que tenemos jurisdicción para entender en el recurso de revisión instado por la recurrente[3] conforme a las disposiciones de las Reglas 53.1(b) y 53.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y de la Ley de la Judicatura, según enmendada, 4 L.P.R.A. secs. 35 y 37.

Determinada nuestra jurisdicción, procedemos a resolver el recurso en sus méritos.

### III

■ Ciertamente el principio de prorrateo, esto es, de que cada municipio obtenga el correspondiente pago de patentes por aquella actividad económica que se materializa dentro de su jurisdicción geográfica, independientemente de si la misma se devenga o contabiliza finalmente por una casa u oficina principal en otra municipalidad, es el principio general que estructura la Ley de Patentes Municipales. 21 L.P.R.A. sec. 651 *et seq.* Véanse: *Banco Popular v. Mun. de Mayagüez*, 120 D.P.R. 692 (1988); *Coca Cola v. Municipio de Aguadilla*, 99 D.P.R. 839, 841 (1971). De esta manera, al autorizar la imposición y el cobro de patentes, el estatuto dispone en lo pertinente:

> Cuando se trate de personas con oficinas o almacenes que sean separados y distintos a cualquier otro negocio o industria que se tenga en la oficina o casa principal de dicha organización, en el mismo municipio, les será impuesta la patente separadamente, pero tratándose de industrias o negocios que se tengan tanto en la casa principal, así como en cualquier sucursal o

---

[3] A esos efectos, mediante Resolución de 2 de noviembre de 1990 ordenamos al Secretario General de este Tribunal que expidiera un mandamiento de revisión dirigido al Tribunal Superior, Sala de Carolina, y ordenamos la elevación de los autos a este Tribunal.

almacén de aquélla, en el mismo municipio, la patente se impondrá únicamente a la casa principal, pero sobre la base del volumen de negocios total de las industrias o negocios que se tienen en la casa principal y en todas sus sucursales y almacenes. Disponiéndose, sin embargo, que cuando se trate de industrias o negocios con oficina principal establecida en determinado municipio y manteniendo otras organizaciones de industria o negocio, oficinas, sucursales o almacenes haciendo negocios en otros municipios que no sea donde radica la casa principal, la patente municipal debe ser impuesta por cada municipio en donde la casa principal mantenga oficinas, sucursales, almacenes u otras organizaciones de industria o negocio a base del volumen de negocios realizados por o a nombre de la casa principal en dicho municipio. 21 L.P.R.A. sec. 651b.

■ Asimismo se adopta como regla general en la definición del concepto "volumen de negocios", fundamento sobre el cual se computa el pago correspondiente, la siguiente:

..."volumen de negocios" significa los ingresos brutos que se reciben o se devenguen por la prestación de cualquier servicio, por la venta de cualquier bien, o por cualquier otra industria o negocio en el municipio donde la casa principal realiza sus operaciones, o los ingresos brutos que se reciban o se devenguen por la casa principal en el municipio donde ésta mantenga oficinas, almacenes, sucursales, planta de manufactura, envase, embotellado, procesamiento, elaboración, confección, ensamblaje, extracción, lugar de construcción, o cualquier otro tipo de organización, industria o negocio para realizar negocios a su nombre, sin tener en cuenta sus ganancias o beneficios. 21 L.P.R.A. sec. 651a(a)(6)(A).[4]

Este principio permea a través del estatuto. Véanse: 21 L.P.R.A. sec. 651a(a)(6)(B) ("Cuando se trate de negocio financiero ... [e]l ingreso bruto devengado por estas organizaciones sujeto al pago de patentes se distribuirá entre las sucursales de acuerdo a la proporción que guarden todas las clases de depósitos de la sucursal con los depósitos to-

[4] Recientemente esta sección fue enmendada con el fin de añadirle la definición de lo que constituirá ingreso bruto. Ley Núm. 82 de 30 de agosto de 1991. Véase, además, la Ley Núm. 93 de 17 de noviembre de 1992.

tales de la organización"); 21 L.P.R.A. sec. 651a(a)(6)(E) ("El volumen de negocios de personas que mantienen oficinas, almacenes, sucursales o cualquier otro tipo de organización de industrias o negocios en distintos municipios de la Isla se determinará en cada municipio por separado a los efectos de que la casa principal pague las contribuciones que corresponda al respectivo municipio donde radica cada oficina, almacén, sucursal o cualquier otro tipo de organización de industria o negocio"), y 21 L.P.R.A. sec. 651f ("En aquellos casos en que el negocio estuviere localizado en territorio de 2 ó más municipios, se prorrateará la cifra correspondiente al volumen de negocio entre el área en pies cuadrados que la edificación tuviere localizada en cada municipio y la cifra resultante se la aplicará el tipo fijado por las secs. 651 a 652y de este título o por el municipio correspondiente").

*No obstante, la sec. 651a(a)(6)(D) expresamente establece una excepción a esta norma general sobre lo que se considera el volumen de negocios en los casos de servicios de comunicación:*

> (D) Ventas de tiendas, casas de comercio y otras industrias o negocios. — El volumen de negocios será, tratándose de ventas de tiendas, casas de comercio u otras industrias o negocios, el importe de las ventas brutas luego de deducidas las devoluciones; el monto del valor de los fletes y pasajes en cada oficina establecida en cada municipio, tratándose de vehículo para el transporte terrestre; *el importe de lo recaudado por servicios de comunicación, en cada municipio donde mantenga oficinas, tratándose de industria o negocio de esta índole*, y en general el montante de las entradas recibidas o devengadas por cualquier industria o negocio de acuerdo con la naturaleza de la industria o el negocio. (Énfasis suplido.)

*Debemos destacar* que, tanto las enmiendas que se le introdujeron a la Ley de Patentes Municipales en *1991* (Ley Núm. 82 de 30 de agosto), como las extensas enmiendas introducidas mediante la Ley Núm. 93 de 17 de noviembre de 1992, *dejaron inalterada* la sec. 651a(a)(6)(D)

antes citada, *aun cuando para dichas fechas ya el sistema de Cable TV estaba operando ampliamente en Puerto Rico* y era de conocimiento público que esta controversia estaba pendiente de ser adjudicada por los tribunales. *Cf. Asoc. Drs. Med. Cui. Salud v. Morales,* 132 D.P.R. 567 (1993). Obviamente el legislador en dicho momento pudo alterar la excepción contenida en la ley.

Alega la recurrida que allí donde dice "servicios de comunicaciones" debe entenderse que se refiere a los sistemas convencionales de radio y televisión que operan mediante la transmisión abierta de ondas radiales desde una estación matriz y que ni alquilan ni venden sus servicios de comunicación, y no al sistema de comunicación mediante cable el cual depende de toda una infraestructura de líneas de transmisión que requieren instalación directa hasta cada hogar o local que desee sus servicios y por los cuales se cobra una mensualidad determinada. Veamos.

Obviamente, a pesar de tratarse ambos de servicios de comunicación, existen diferencias palpables entre el tipo de actividad comercial que representan las empresas convencionales de radio y televisión, y aquellas que brindan sus servicios a sus subscriptores mediante el sistema de cable. D.L. Brenner, M.E. Price y M.I. Meyerson, *Cable Television and Other Nonbroadcast Video: Law and Policy,* Nueva York, Clark Boardman Callaghan Entertainment and Communications Law Library, 1992; J.C. Goodale, *All About Cable: Legal and Business Aspects of Cable and Pay Television,* ed. rev., Nueva York, Law Journal Seminars-Press, 1988; G.L. Christensen, *Cable Television: Retrospective and Prospective,* Nueva York, Practising Law Institute, 1986; D.H. Ginsburg, *Regulation of Broadcasting: Law and Policy Towards Radio, Television and Cable Communications,* Minnessota, Ed. West Publishing Co., 1979.

Los sistemas convencionales de radio y televisión, conocidos como *broadcast communications services,* consisten en la transmisión aérea de ondas radiales (radiaciones

electromagnéticas que viajan a la velocidad de la luz) visuales y/o auditivas con la intención de que sean captadas directamente por el público en general o a través de estaciones retransmisoras. 47 U.S.C. sec. 153(o). Véase *Allen B. Dumont Laboratories v. Carroll*, 184 F.2d 153, *cert.* denegado, 340 U.S. 929 (1950); *Functional Music, Inc. v. F.C.C.*, 274 F.2d 543, *cert.* denegado, 361 U.S. 813 (1959); Ginsburg, *op. cit.*, pág. 9. Su financiamiento, en caso de estaciones comerciales, depende de las ventas que realicen en concepto de tiempo para anuncios comerciales que se intercalan mediante la interrupción de la programación regular destinada al público (véase Ginsburg, *op. cit.*, págs. 620–622 y 640–645) y no de la venta de sus servicios a suscriptores particulares. Por lo general, su actividad comercial se concentra en unas instalaciones centrales desde donde se produce y transmite su programación, y desde donde se realizan las demás gestiones de mercadeo y ventas. Es allí donde se genera y devenga su volumen total de negocios. Con excepción de alguna estación retransmisora, allí se concentra toda la infraestructura física que necesitan para operar.

Las operaciones de Cable TV se estructuran de forma distinta. Éstas se conocen como *nonbroadcast communication services*. Ginsburg, *op. cit.*, pág. 21; Goodale, *op. cit.*, Sec. 2.03. La ley federal que regula la industria de Cable TV, *Cable Communications Policy Act of 1984*, 47 U.S.C. sec. 521 *et seq.*, la describe como facilidades consistentes en un conjunto de vías cerradas de transmisión, y de equipo relacionado de generación, recepción y control de señales, bajo un propietario común, que distribuye o está diseñado para distribuir tales señales por cable a suscriptores en una comunidad. Véanse: 47 U.S.C. sec. 522; 47 C.F.R. sec. 76.5 (1991); Goodale, *op. cit.*, Sec. 2.03; Brenner, Price y Meyerson, *op. cit.*, Sec. 1.04.

A tales efectos, el sistema depende del tendido y construcción de una complicada red de cables que se ramifican

y extienden su paso desde el centro de transmisiones hasta los televisores en los hogares de los suscriptores.[5] En general, el sistema consta de tres (3) componentes: la estación central, la red de distribución y los terminales. Brenner, Price y Meyerson, *op. cit.*, Sec. 1.03; Christensen, *op. cit.*, págs. 20–23. El primero constituye el cerebro del sistema y son las facilidades desde donde se recibe, procesa y alimenta el material de programación en la red de distribución. El segundo consiste de la cablería (usualmente de cable coaxial) que parte desde la estación central a través de los postes de teléfono y energía eléctrica o de forma soterrada, y de un sistema de alimentación a través de amplificadores localizados a lo largo de las líneas de cable. Finalmente, los terminales constituyen el destino de la señal transmitida. Consisten éstos de los aparatos de televisión de los suscriptores y pueden, además, incluir una caja convertidora que cambia la frecuencia de la señal y permite el que sea proyectada como es debido. Brenner, Price y Meyerson, *op. cit.*; Christensen, *op. cit.* Véase *Leathers v. Medlock*, 499 U.S. 439, 442 (1991). En consecuencia, utilizan un derecho de paso sobre la propiedad municipal que no ejercitan las televisoras y radio difusores tradicionales.[6]

En términos financieros, distinto a las emisoras ordina-

---

[5] Al respecto señalan Brenner, Price y Meyerson:

"Cable television systems receive television, radio, or other electronic signals by means of antennae, including microwave and satellite earth stations. They may also generate their own signals and deliver them by microwave or coaxial cable to a headend. At the headend they are amplified, processed, and then fed into a distribution path. This path consists of coaxial trunk lines, feeder cables, and drop cables. Drop cables carry signals to terminal blocks on a subscriber's premises, and ultimately, to television receivers or data terminals." D.L. Brenner, M.E. Price y M.I. Meyerson, *Cable Television and Other Nonbroadcast Video: Law and Policy*, Nueva York, Clark Boardman Callaghan Entertaiment and Communications Law Library, 1992, Sec. 1.03. Véase *U.S. v. Southwestern Cable Co.*, 392 U.S. 157, 161 (1968).

[6] La legislación federal que regula el campo *mandatoriamente* concede a las compañías de Cable TV derechos de servidumbre sobre la propiedad utilizada para usos compatibles. 47 U.S.C. sec. 533(b)(2). Véanse: Brenner, Price y Meyerson, *op. cit.*, Sec. 3.03; *Rollins Cablevue, Inc. v. Saienni Enterprises*, 633 F. Supp. 1315 (D. Del. 1986).

rias, los sistemas de Cable TV comúnmente le cobran a sus suscriptores cargos por instalación y mensualidades. *U.S. v. Southwestern Cable Co.*, 392 U.S. 157, 162 (1968). Por ello tienen la capacidad de ofrecer una programación de películas y otros entretenimientos sin necesidad de interrupciones para anuncios comerciales. 1984 U.S. Code Cong. & Admin. News 4658. A tales efectos, podemos señalar que las cajas registradoras en las compañías de Cable TV son los televisores de los usuarios. Brenner, Price y Meyerson, *op. cit.*, Sec. 1.03[4]. El volumen de negocio obtenido en cada municipio particular es perfectamente identificable.

Finalmente, el sistema de Cable TV se diferencia del sistema de libre recepción de radio y televisión en que, contrario al caso de estas últimas, la legislación federal que ocupa el campo provee para que los gobiernos municipales donde éstos operan, siempre y cuando estén autorizados por la legislatura estatal, ejerzan poderes de reglamentación y licencia sobre aquellas, dentro de los parámetros de la ley. 47 U.S.C.A. sec. 541 *et seq.*

> The Cable Act left franchising to state or local authorities; those authorities were also empowered to specify the facilities and equipment that franchisees were to use .... *City of New York v. FCC*, 486 U.S. 57, 61 (1988). Véanse: 1985 U.S. Code Cong. & Admin. News, *supra; Chicago Cable Communications v. Chicago Cable Com'n*, 678 F. Supp. 734, 746 (Ill. 1988); *Jones Intercable v. City of Stevens Point, Wis.*, 729 F. Supp. 642, 649 (Wis. 1990); *Rollins Cablevue, Inc. v. Saienni Enterprises*, 633 F. Supp. 1315, 1318 (Del. 1986); Brenner, Price y Meyerson, *op. cit.*, Secs. 10.02–10.04; Goodale, *op. cit.*, Secs. 4.01–4.07.

No obstante, independientemente de que existan bases que justifiquen tratar a este medio de un modo distinto a otros medios de comunicación, *el legislador no hizo distinción alguna al aprobar la Ley de Patentes Municipales. Corresponde a la Asamblea Legislativa y no a este Foro tomar acción al respecto.* Véanse: *Asoc. Drs. Med. Cui. Salud v.*

*Morales*, supra; *Torres García v. F.S.E.*, 111 D.P.R. 469, 474 (1981); *Famania v. Corp. Azucarera de P.R.*, 113 D.P.R. 654, 657–658 (1982); *González Chemical v. Srio. de Hacienda*, 86 D.P.R. 72, 78 (1962); *Rivera Coll v. Tribunal Superior*, 103 D.P.R. 325, 331 (1975); *Cruz Fontánez v. Registrador*, 126 D.P.R. 182 (1990); *Calderón v. Adm. Sistemas de Retiro*, 129 D.P.R. 1020 (1992); Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Véase, en general, R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev. y amp., San Juan, Pubs. J.T.S., 1987, Vol. I, págs. 299–303.

"El poder judicial no puede suplir la acción del poder legislativo imponiendo a los demandados condiciones que la Legislatura no ha tenido a bien imponerles." *Dottin v. Rigo & Co.*, 22 D.P.R. 405, 409 (1915). "No es atendible en este foro el argumento de la recurrente sobre el impacto oneroso que tiene el estatuto en sus finanzas. Nuestra función es interpretar la ley y no juzgar su bondad o sabiduría." *Famania v. Corp. Azucarera de P.R.*, supra, págs. 657–658. "Aunque simpatizamos con el planteamiento, reconocemos que éste es un asunto que versa eminentemente sobre las metas de la política fiscal y social que es providencia de la Asamblea Legislativa. Es ésta la que luego de considerar todos los factores envueltos incluyendo el impacto económico, que evidentemente es enorme, debe tomar la decisión final." *Torres García v. F.S.E.*, supra, pág. 474.

■ Tal como dispone expresamente el estatuto, en casos de servicios de comunicación, corresponde el pago de las patentes *en el municipio donde mantienen oficinas*. Nada hayamos en el historial legislativo que nos permita llegar a la conclusión de que la intención del legislador al incluir la disposición en cuestión era proveer una fórmula para el cómputo de patentes únicamente en cuanto a los

servicios de comunicación de difusión pública y no para las que transmiten por el sistema cerrado de cable.

El análisis de las antiguas leyes de patentes municipales —Ley Núm. 26 de 28 de marzo de 1914 y Ley Núm. 27 de 12 de junio de 1971— abonan en esa dirección. En lo concerniente al pago de patentes *por las compañías de teléfono y de energía eléctrica, las cuales resultan muy similares a la industria de Cable TV en cuanto dependen de una presencia física en cada municipio y sus ventas en cada uno son identificables,* los referidos estatutos disponían que éstas se pagarían en el municipio donde mantuvieran *oficinas.*([7])

■ Al interpretar la disposición contenida en la Ley Núm. 26, antes mencionada, en *P.R. Telephone Co. v. Municipio de Mayagüez,* 103 D.P.R. 581 (1975), señalamos que la Telefónica no venía obligada a pagar patentes en los municipios en que no tiene oficinas para llevar a cabo sus negocios. Al efecto dispusimos:

> Surge de la prueba que la Telefónica mantiene, o mantenía a la fecha de los hechos, oficinas en Mayagüez pero no en los pueblos de Aguadilla, San Sebastián, Aguada, Moca, Añasco, San Germán, Hormigueros, Sabana Grande, Lajas, Maricao, Lares, Las Marías, Cabo Rojo y Rincón. La oficina de Mayagüez era una oficina central donde se atendían las actividades comerciales de la recurrida en relación con los mencionados pueblos.
>
> En cada uno de dichos pueblos la recurrida tiene un edificio donde está instalado un equipo automático que hace posible las comunicaciones telefónicas en esos lugares. Dicho equipo funciona sin ayuda de personal alguno. Empleados de la recurrida visitan periódicamente esos edificios para obtener información,

---

([7]) Disponía la Ley Núm. 26 de 28 de marzo de 1914, según enmendada, en lo pertinente:

"Se entenderá por volumen de negocios para los efectos de esta ley ... el importe de lo recaudado por servicios telefónicos o eléctricos, en cada municipio *donde mantenga oficinas* ...." (Énfasis suplido.) Sec. 4 de la Ley Núm. 26 de 28 de marzo de 1914, según enmendada por la Ley Núm. 93 de 25 de junio de 1962.

Por su parte, la Ley Núm. 27 de 12 de junio de 1971, la cual derogó la referida Ley Núm. 26, incorporó una disposición idéntica a la citada.

la cual pasan a sus libros. La recurrida tiene en cada uno de esos pueblos uno o más agentes, usualmente farmacias, los cuales están autorizados a recibir pagos de los usuarios. La recurrida compensa a dichos agentes por sus servicios mediante comisión. Los usuarios pueden pagar allí localmente o directamente en la oficina central en Mayagüez.

. . . . . . . .

Conforme a la citada sección la patente debía imponerse sobre los ingresos brutos de la casa principal obtenidos en el municipio donde dicha casa mantenía oficina y, tratándose de empresas de servicios telefónicos, los ingresos brutos serían el importe de lo recaudado por dichos servicios en el municipio donde la compañía tuviese oficina. *A la luz de los hechos de este caso debemos resolver que la Telefónica no tenía oficinas, a los efectos de la ley que interpretamos, en los pueblos antes mencionados pero sí la tenía en Mayagüez.* Desde luego, lo recaudado por los agentes de cobro —en las farmacias— en los distintos pueblos mencionados debe considerarse parte del importe de lo recaudado en la oficina central en Mayagüez, pues es allí donde se llevaban a cabo los negocios de la Telefónica para dichos fines.

*La recurrida no venía obligada a pagar patentes en los municipios mencionados en que no tiene oficinas para llevar a cabo negocios. Dicho requisito de tener oficinas lo fija la propia ley que hemos citado.* (Énfasis suplido.) *P.R. Telephone Co. v. Municipio de Mayagüez,* supra, págs. 582–583.([8])

No necesitamos abundar al respecto. Corresponde al legislador, y no a este Foro, tomar acción si se quiere cambiar el claro mandato legislativo.

En vista de lo antes expuesto, *se revoca la sentencia del tribunal de instancia. Se dictará sentencia de conformidad.*

El Juez Presidente Señor Andréu García se inhibió. El Juez Asociado Señor Fuster Berlingeri disintió con una opinión escrita.

---

([8]) Es un principio conocido de hermenéutica que el legislador conoce la interpretación que este Foro ha hecho a las leyes. El citado caso *P.R. Telephone Co. v. Municipio de Mayagüez,* fue resuelto en 1975. Tanto en 1991 como en 1992 el legislador enmendó extensamente la Ley de Patentes Municipales, conociendo la existencia de dicho caso, y sin embargo no alteró la disposición en la cual se fundamenta el dictamen del mismo, el cual es cónsono con lo aquí resuelto.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

El recurso ante nuestra consideración requiere que determinemos cuál es precisamente el mandato legislativo en cuanto a quién deben pagarse las patentes municipales en negocios como el de Cable TV. Es mi criterio que la Ley de Patentes Municipales no tiene una disposición meridianamente clara sobre el particular, lo que hace necesario investigar cuál fue exactamente la intención legislativa respecto a este asunto.

Como bien se señala en la opinión de la mayoría, el principio de prorrateo permea toda la estructura de la Ley de Patentes Municipales. En ese estatuto, el legislador estableció sin duda alguna la norma general de que cada municipio debe obtener el pago correspondiente de patentes por aquella actividad económica que se lleva a cabo dentro de su jurisdicción geográfica.

Este esencial principio de prorrateo es, además, una condición necesaria para cumplir con el fundamental propósito legislativo que informa el nuevo orden de gobierno municipal establecido en Puerto Rico en 1991. En ese año, la Asamblea Legislativa adoptó la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, con el fin de otorgarle a los gobiernos municipales una nueva dimensión de autonomía y de responsabilidad. Para hacerla viable, la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 procura proveerle a *todos* los municipios del país las herramientas económicas necesarias para asumir un rol gubernamental más central y de mayor alcance que el que jugaban antes. Así se señala expresamente no sólo en la exposición de motivos de dicha ley, sino también en su Art. 1.002 (21 L.P.R.A. sec. 4001 n.), que contiene la declaración de política pública. En 1991, la

Asamblea Legislativa también aprobó extensas enmiendas a la Ley de Patentes Municipales. Estas enmiendas, según surge de la exposición de motivos de este otro estatuto (Ley Núm. 82 de 30 de agosto de 1981), persiguen fortalecer e incrementar la base fiscal de todos los municipios para que puedan cumplir cabalmente con sus nuevas responsabilidades, particularmente aquellos municipios de menor población e ingreso.

Como puede observarse, pues, la clara intención legislativa es la de fortalecer económicamente a *todos* los municipios de Puerto Rico, para que puedan cumplir con su acrecentada encomienda pública, meta que se hace viable indiscutiblemente a través del principio de prorrateo aludido y que consolida la importancia y el carácter esencial que la propia Ley de Patentes Municipales expresamente le confiere a ese principio.

Frente a este claro y fundamental mandato legislativo, tenemos lo dispuesto en el Art. 1 de la Ley de Patentes Municipales, según enmendada, 21 L.P.R.A. sec. 651a(a)(7)(D), sobre la cual descansa esencialmente la opinión de la mayoría. La aludida sección indica que el "volumen de negocios" en los casos de servicios de comunicación será "el importe de lo recaudado [(por dichos servicios)] en cada municipio donde mantenga oficinas...". De este parco lenguage la mayoría deriva la supuesta intención del legislador de hacer una excepción al abarcador y fundamental principio de prorrateo en casos de negocios como el de Cable TV. La mayoría en su opinión no cita fuente alguna que siquiera sugiera o intime que el legislador, en efecto, quiso hacer tal excepción al principio de prorrateo. No se hace referencia a informes legislativos o a discusiones en el hemiciclo, o a otras expresiones legislativas que permitan verificar o corroborar la supuesta intención de hacer la excepción aludida. Ni siquiera se presentan consideraciones de orden público o razones que expliquen por qué el legislador supuestamente quiso hacer una excepción al principio de

prorrateo en casos como el de marras. La única y estrecha base de la opinión de la mayoría es el escueto y limitado lenguage de la sección aludida.

En lo que a mí respecta, me parece azaroso implicar la importante excepción en cuestión sólo a base del texto literal de la corta y exigua sección referida. No sólo porque ello sería contrario al esencial y comprensivo principio de prorrateo que tan claramente ordenó el legislador para la generalidad de los negocios y empresas que pagan patentes municipales, sino que, además, porque ello sería contrario también al claro sentido y a los claros propósitos del nuevo orden municipal que se estableció en Puerto Rico en 1991 y al nuevo esquema legislativo que se aprobó ese año para efectuar la fundamental reforma de los gobiernos municipales.

Además, resulta que la parca sección aludida sobre la cual descansa la opinión de la mayoría es razonablemente susceptible de una interpretación *distinta* a la que le da la mayoría en su opinión. Puede entenderse, de otro modo, que además sería cónsono con el principio de prorrateo y con el propósito de la legislación de 1991 de proveerle herramientas económicas suficientes a todos los municipios.

La sección en cuestión forma parte de un articulado más extenso que intenta definir cuál es el volumen de negocios sobre el cual deben imponerse las patentes municipales. Como dichas patentes han de extenderse a distintos tipos de industrias o actividades comerciales, el articulado contiene diversas definiciones sobre cuál es el volumen de negocios tributable, dependiendo las mismas del tipo de industria o actividad comercial concernida. En otras palabras, las disposiciones aludidas van dirigidas esencialmente a identificar el *corpus* sobre el cual se fijarán las patentes municipales, que varía dependiendo de la naturaleza de la empresa comercial sobre la cual se han de imponer las patentes. Parece razonable suponer que el propósito de las disposiciones aludidas fue estrictamente el de

concretar sobre cuáles eventos y actividades recaerá la patente municipal. No hay nada en el texto de la ley realmente que indique que la disposición que nos ocupa tiene otro propósito que no sea el ya identificado. Sin embargo, la mayoría en su opinión le atribuye a esa parca disposición *un segundo propósito*: el de determinar a *qué municipio* ha de pagarse la patente municipal. Esta interpretación de la mayoría parece infundada, ya que por sus propios términos dicha sección persigue solamente definir cuál es el "volumen de negocios" específico sobre el cual recaerá la patente municipal en cuestión. El otro asunto de a qué municipio han de pagarse las patentes se establece en disposiciones aparte, como por ejemplo sub-subinciso (E) del articulado en cuestión, que expresamente señala que la casa principal pagará las contribuciones que correspondan al respectivo municipio donde radica cada oficina, almacén, sucursal o cualquier otro tipo de organización de industria o negocio.

En otras palabras, unas disposiciones identifican sobre qué evento o actividad recaerá la patente y otras a qué municipio se le pagará la patente. El problema con la opinión de la mayoría es que a pesar de que existen distintas disposiciones para distintos propósitos, le atribuye ambos fines a la parca sec. 651a(6)(D) antes citada, aunque por sus propios términos literales dicha sección sólo parece dirigida a definir el *corpus* sobre el cual recae la patente municipal. Por así interpretar dicha sección, se da al traste con el esencial principio general de prorrateo que informa la legislación de patentes municipales abarcadoramente y se socava la clara y aún más importante intención legislativa de proveerle a *todos* los municipios las herramientas económicas que necesitan para cumplir cabalmente su cometido en el nuevo orden municipal que se estableció en el país en 1991.

Como no creo que la interpretación de la mayoría está compelida por un fundamento inexpugnable, y como creo,

al contrario, que existe otra interpretación que está en armonía con los principios generales que, fuera de toda duda, estableció el legislador sobre prorrateo municipal y sobre la habilitación económica de *todos* los municipios, disiento de la opinión mayoritaria.