El Juez Asociado Señor Rivera Pérez
emitió la opinión del Tribunal.
El Ledo. Rafael Hernández Colón y el Ledo. Carlos Romero Barceló, ambos ex gobernadores de Puerto Rico, nos solicitan que revisemos la sentencia emitida por el Tribunal de Apelaciones. El foro apelativo intermedio dictaminó que la acción administrativa de la Policía de Puerto Rico no era revisable judicialmente. Ello, por entender que la actuación del Superintendente de la Policía de eliminar la protección mediante escoltas a los ex gobernadores es discrecional.
Analicemos los hechos y el trámite procesal que originaron la presente controversia.
I
Las escoltas policiacas para los ex gobernadores de Puerto Rico se originaron en el 1965, cuando el Sr. Luis Muñoz Marín dejó de ser el Primer Ejecutivo de Puerto Rico. Debido al cese de sus funciones como Gobernador, la Policía de Puerto Rico entendió necesario otorgarle una escolta para proteger su seguridad y vida. La decisión de proveerle protección mediante el uso de escoltas al ex Gobernador, señor Muñoz Marín, surgió de unos análisis periciales y de la interpretación realizada por la Policía de Puerto Rico al Art. 3 de la Ley Núm. 77 de 22 de junio de 1956, mejor conocida como la Ley de la Policía.(1) Desde entonces se sentó el precedente de conceder protección mediante escoltas policiacas a los posteriores ex gobernadores de Puerto Rico.
*128 El 17 de mayo de 2006, sin realizarse un estudio pericial sobre el gasto del erario público o de algún otro asunto relacionado al servicio de escoltas de los ex gobernadores, el Gobernador de turno, Ledo. Aníbal Acevedo. Vilá, envió una misiva al entonces Superintendente de la Policía, el Ledo. Pedro Toledo Dávila, para que suspendiera el servicio de protección ofrecido hasta ese entonces a los ex gobernadores. Recibida la directriz, el Superintendente de la Policía, licenciado Toledo Dávila, acató la orden del entonces primer mandatario y retiró las escoltas que proveían seguridad personal a todos los ex gobernadores de Puerto Rico. La decisión de eliminar las escoltas de los ex gobernadores no contaba con el aval de la Legislatura de turno; por ello, el entonces Gobernador, licenciado Acevedo Vilá, fundamentó su decisión en los poderes inherentes del cargo de Primer Ejecutivo y en su facultad para emitir órdenes ejecutivas.
Antes de eliminar la protección brindada por las escoltas a los ex gobernadores, la Legislatura de Puerto Rico nunca se pronunció contra el uso de éstas. La Legislatura de Puerto Rico continuó avalando la interpretación impartida al Art. 3 de la Ley de la Policía.(2) Desde el 1956 nunca se realizó enmienda alguna a tal disposición que afectara la protección mediante escoltas a los ex gobernadores. El Art. 3 de la Ley de la Policía de 1956, supra, estatuía lo siguiente:
Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará “Policía de Puerto Rico” y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, prevenir, descubrir y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a éstas se promulguen.
Cuando se aprobó la Ley de la Policía de 1974, el Art. 3 disponía lo siguiente:
*129 Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará “Policía de Puerto Rico” y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a ésta se promulguen. Los miembros del Cuerpo de Policía estarán comprendidos en el Servicio de Carrera.(3)
La única enmienda que se realizó al Art. 3 de la Ley de la Policía de 1974, supra, fue la inclusión de lo siguiente: “observar y procurar la más absoluta protección de los derechos civiles del ciudadano .... Los miembros del Cuerpo de Policía estarán comprendidos en el Servicio de Carrera.” Cuando se aprobó la Ley de la Policía de 1996, el Art. 3, supra, tampoco sufrió enmienda material alguna y su redacción permaneció prácticamente igual a la Ley de la Policía de 1974, excepto que se añadió el verbo investigar precedido por el verbo descubrirá.(4)
El 9 de noviembre de 2006 la Asamblea Legislativa aprobó el Proyecto del Senado Núm. 121 con el propósito de enmendar el Art. 30 de la Ley Orgánica de la Policía, 25 L.P.R.A. see. 3129. El propósito de tal proyecto de ley era estatuir explícitamente el derecho de los ex gobernadores de recibir protección y seguridad mediante escoltas policiacas. El proyecto de ley fue vetado por el entonces Gobernador, licenciado Acevedo Vilá, sin expresar motivo o razón alguna a la Legislatura de Puerto Rico.
*130 Sobre este proyecto es importante reseñar que el 19 de octubre de 2006, la Comisión de lo Jurídico de la Cámara de Representantes emitió un informe cuyas conclusiones son pertinentes a la controversia de autos. El informe reafirma que la protección mediante escoltas policiacas al señor Muñoz Marín surgió de la interpretación del Art. 3 de la Ley de la Policía de 1956, supra. Por la importancia del contenido del referido informe citamos literalmente de éste lo siguiente:
La Ley de la Policía de 1956 se derogó en 1974, mediante la Ley Núm. 26 aprobada el 22 de agosto de 1974. Al aprobar esta Ley, la Legislatura estaba consciente de que la Policía proveía protección y seguridad a estos ex-Gobernadores. La Ley de 1974 no proveyó disposición alguna sobre esta protección, la cual se continuó brindando por la Policía de Puerto Rico bajo el Artículo 3 que delegaba en al [sic] Policía la obligación de protección a las personas y a la propiedad.
La Ley de la Policía de 1974 fue derogada en 1996 por la Ley Núm. 53 de 10 de junio de ese año. Al aprobarse esta ley la Legislatura estaba plenamente consciente de la práctica que se había establecido por la Policía de Puerto Rico de proveer protección y seguridad a los ex-Gobernadores bajo el artículo 3 que disponía la delegación del poder de protección a personas y propiedades de la policía.
Esta práctica de la Policía de brindar protección sin límite de tiempo a los ex-Gobernadores era una práctica pública y notoria por cuanto todos los desplazamientos de los ex-Gobernadores a cualquier lugar del país se llevaban a cabo con su correspondiente escolta.
Al día de hoy todos los ex-Gobernadores disfrutan de la protección y seguridad que les fue brindada desde el momento de su retiro .... Incluso, aún cuando no se desprende claramente de la Ley que los ex-Gobernadores tendrán derecho a escoltas, el propio Superintendente de la Policía de Puerto Rico reconoce que esta escolta es un derecho adquirido por estos ex-funcionarios .... (Énfasis suplido.) Apéndice de la Petición de certiorari, pág. 392.
Ante la decisión del entonces Gobernador, licenciado Acevedo Vilá, de vetar el Proyecto del Senado 121 y de ordenar la eliminación del servicio de escoltas a todos los *131 ex gobernadores efectivo el 31 de diciembre de 2006, el 8 de diciembre de 2006, el ex Gobernador, licenciado Hernández Colón, presentó una solicitud de revisión sobre la decisión administrativa de suspender las escoltas a los ex gobernadores. El 15 de diciembre de 2006 el licenciado Hernández Colón presentó ante el Tribunal de Apelaciones una moción en auxilio de jurisdicción para que se paralizara la determinación del Superintendente de la Policía hasta que se determinara si como ex Gobernador tenía un derecho adquirido a protección mediante escoltas.
El 20 de diciembre de 2006 el licenciado Romero Barceló presentó una Petición de Revisión de Decisión Administrativa ante el Tribunal de Apelaciones. Para esa misma fecha y ante ese mismo foro, también, presentó una moción en auxilio de jurisdicción para que se dejara sin efecto la decisión administrativa tomada por la Policía de Puerto Rico hasta que se determinara si la protección brindada por las escoltas era o no un derecho adquirido. El mismó día, el licenciado Romero Barceló presentó una solicitud para que se consolidara su caso con el del también ex Gobernador, licenciado Hernández Colón, que trata sobre idéntica controversia. El 20 de diciembre de 2006 el Tribunal de Apelaciones dictó resolución consolidando ambos recursos y requiriéndole al peticionario, licenciado Romero Barceló, que evidenciara la notificación de los recursos y escritos presentados por su representación legal. Por otro lado, le concedió un término fijo al Procurador General para que se expresara sobre las referidas solicitudes en auxilio de jurisdicción así como la de consolidación de los recursos.
Los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, basan su reclamo en que se enteraron informalmente de la directriz emitida por el entonces Gobernador, licenciado Acevedo Vilá. Arguyen que les enviaron comunicaciones escritas al Superintendente de la Policía, licenciado Toledo Dávila, para que éste dejara sin efecto la suspensión de las escoltas o, en la alternativa, que *132 se les garantizara su derecho a un debido proceso de ley para dilucidar la posible existencia de un derecho adquirido. Tal pedido fue rechazado por el Superintendente de la Policía, el licenciado Toledo Dávila. El peticionario, licenciado Romero Barceló añadió que cuando decidió postularse para el cargo de gobernador de Puerto Rico consideró que éste y su familia contarían con la protección de las escoltas policiacas una vez cesara en el cargo.
Por otra parte, el argumento principal del Procurador General es la falta de jurisdicción del Tribunal de Apelaciones para atender el recurso de revisión presentado por los peticionarios. Apoya tal argumento en que las órdenes ejecutivas no son revisables según la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (la L.P.A.U.).(5) En la alternativa, que no estamos ante una actuación administrativa de carácter adjudicativo por lo que dicha actuación no está sujeta a revisión judicial según la L.P.A. U.
El 26 de diciembre de 2006 el Procurador General presentó una solicitud urgente de prórroga para la presentación de su réplica, así como para que se le concediera autorización para presentar un escrito en exceso de las páginas reglamentarias. El mismo día el licenciado Romero Barceló presentó una moción aclaratoria sobre el alcance de las resoluciones emitidas por el Tribunal de Apelaciones, en la cual solicitó que no se le concediera una prórroga al Procurador General para expresarse. Ello, para que se atendiera con premura su solicitud en auxilio de jurisdicción. El licenciado Hernández Colón realizó un pedido similar.
También, el 26 de diciembre de 2006 el Procurador General presentó una Moción de Desestimación y en Oposición a Moción Solicitando Orden en Auxilio de Jurisdicción. Alegó que los peticionarios no habían establecido las condiciones necesarias para que se les concedieran sus mociones en *133 auxilio de jurisdicción. Nuevamente, argüyó que el Tribunal de Apelaciones carecía de jurisdicción. El 27 de diciembre de 2006 el Tribunal de Apelaciones emitió una resolución en la cual declaró “NO HA LUGAR” a las mociones en auxilio de jurisdicción y le concedió a las partes hasta el 16 de enero de 2007 para que presentaran sus respectivos alegatos así como cualquier alegato suplementario sobre los méritos del recurso y sobre la jurisdicción del foro apelativo intermedio para atender la controversia de autos.
El 16 de enero de 2007 los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, presentaron mociones en oposición a la moción de desestimación por falta de jurisdicción presentada por el Procurador General, expresándose sobre los méritos del recurso y sobre la jurisdicción del Tribunal de Apelaciones. Refutaron los argumentos presentados por el Procurador General para solicitar la desestimación del caso. El 18 de enero de 2007 el Procurador General presentó una moción de autorización para replicar a los escritos presentados por los peticionarios en oposición a la moción de desestimación. El 19 de enero de 2007 el Tribunal de Apelaciones emitió una resolución concediéndole tiempo adicional al Procurador General para replicar a los escritos suplementarios presentados por los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, e igualmente les extendió el término a éstos para que reaccionaran de entenderlo necesario. El 22 de enero de 2007, el peticionario, licenciado Romero Barceló, presentó una Moción de Reserva de Derechos expresando que sometió una solicitud de “injunction” sobre la controversia de autos ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico.(6)
El 23 de enero de 2007 el Procurador General presentó su Réplica a Oposiciones a Moción de Desestimación. El 26 *134 de enero de 2007, el peticionario, licenciado Romero Barceló, replicó a la moción del Procurador General. En idéntica fecha, el peticionario, licenciado Hernández Colón, presentó su Oposición a la Réplica del Procurador.
Para el 26 de febrero de 2007, el Tribunal de Apelaciones emitió sentencia declarándose sin jurisdicción para atender el asunto. El foro apelativo intermedio entendió que no existía disposición estatutaria alguna que le otorgara el derecho a los ex gobernadores a recibir seguridad y protección mediante escoltas policiacas. Por ello, dictaminó que la eliminación de las escoltas a los ex gobernadores reside sobre el poder discrecional del Superintendente de la Policía. El 2 de abril de 2007 el peticionario, licenciado Romero Barceló, presentó una moción de reconsideración y el 13 de abril de 2007 el Tribunal de Apelaciones emitió una resolución declarándola “NO HA LUGAR”.
Inconformes con el dictamen emitido por el Tribunal de Apelaciones, los ex gobernadores y aquí peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, acuden ante nos y en esencia nos hacen los señalamientos de error siguientes:
Erró el Tribunal de Apelaciones al desestimar el recurso incoado, denegando la petición del Recurrente para que se honre su derecho adquirido al servicio de la seguridad y protección policiaca, en su carácter de ex-gobernador. Caso Núm. CC-2007-356, Alegato, pág. 8.
Erró el Tribunal de Apelaciones al concluir que la decisión de la Policía no era revisable porque [los recurrentes] no había [n] adquirido un derecho a recibir protección bajo la interpretación que hizo la Policía del artículo 3 de su Ley Orgánica, sancionada por la Legislatura, en virtud de la cual la Policía siguió, por 41 años, la práctica de proveer protección de por vida a los ex Gobernadores.
Erró el Tribunal de Apelaciones al concluir que la decisión de la Policía no era revisable porque los [recurrentes] no adquirí [eron] mi derecho a protección bajo el artículo 7 del Código Civil que establece la equidad ... como fuente de derecho, debido a que los principios generales del derecho no amparan cuando implican una erogación de fondos públicos.
Erró el Tribunal de Apelaciones al concluir que la decisión de *135 la Policía no era revisable porque el Superintendente no tenía que seguir el procedimiento establecido en la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) para adjudicar el planteamiento de [los recurrentes] y concluir que el debido proceso no requería que se siguiera ese procedimiento.
Erró el Tribunal de Apelaciones al concluir que la decisión del Superintendente no era revisable judicialmente por tratarse de un asunto que caía dentro de la discreción administrativa. Caso Núm. CC-2007-347, Petición de certiorari, pág. 13.
Por estar los señalamientos de error íntimamente relacionados entre sí procederemos a discutirlos en conjunto.
II
Todo tribunal tiene la ineludible tarea de auscultar su jurisdicción para atender y resolver el asunto ante su consideración, así como revisar la jurisdicción de los foros de donde proviene el recurso en cuestión.(7) Como expusimos en la parte I, los peticionarios presentaron solicitudes por escrito ante el Superintendente de la Policía. Tales peticiones, según el licenciado Hernández Colón y el licenciado Romero Barceló, tenían el propósito de solicitar que se dilucidara la determinación de la Policía de Puerto Rico de eliminar la protección de escoltas a los ex gobernadores y aquí peticionarios. Ante tal argumento, resulta procedente examinar la See. 2152 de la L.P.A.U., la cual dis-pone lo siguiente:
Excepto cuando por ley se establezca de otro modo el procedimiento adjudicativo ante una agencia podrá iniciarse por la propia agencia, o con la presentación de una querella, solicitud o petición, ya sea personalmente o mediante comunicación por escrito, en el término que establezca la ley o el reglamento, en relación a un asunto que esté bajo la jurisdicción de la agencia. (Énfasis suplido.)(8)
*136 El Superintendente de la Policía denegó el pedido de los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, sin tomar en cuenta la posibilidad real e inminente de estar interviniendo con un derecho propietario protegido constitucionalmente. El Superintendente de la Policía aprobó la Resolución Núm. OS-1-16-330 donde dispuso de los recursos de los peticionarios. Por lo tanto, los peticionarios, licenciado Romero Barceló y el licenciado Hernández Colón, agotaron los recursos administrativos disponibles ante dicha agencia administrativa.
El propósito de la doctrina de agotamiento de remedios o recursos administrativos es determinar el momento en que se puede solicitar la intervención de los tribunales. La norma pretende evitar que una parte presente un recurso ante los tribunales de justicia sin que la agencia administrativa haya tomado una determinación final en el asunto.(9) La L.P.A.U. dispone en su See. 2172 lo siguiente:
Una parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente podrá presentar una solicitud de revisión ante el Tribunal de Apelaciones, dentro de un término de treinta (30) días contados a partir de la fecha del archivo en autos de la copia de lá notificación de la orden o resolución final de la agencia. ...
La revisión judicia l aquí dispuesta será el recurso exclusivo para revisar los méritos de una decisión administrativa, sea ésta de naturaleza adjudicativa o de naturaleza informal, emitida al amparo de este capítulo. (Enfasis suplido.)(10)
Hemos expresado que una orden o resolución final es aquella que dispone de la controversia ante la agencia y *137 tiene efectos adjudicativos y dispositivos sobre las partes,(11) Lo determinante no es el nombre que la agencia le dé a su actuación, sino considerar el estado de derecho vigente al momento del procedimiento administrativo y si la determinación que se pretende revisar es final.(12)
En Puerto Rico, así como en la jurisdicción federal, existe el recurso de revisión judicial para revisar las resoluciones u órdenes finales de una agencia administrativa.(13) Los tribunales de justicia son los llamados a interpretar la Constitución así como la legislación vigente. En el caso de autos no encontramos ninguna limitación establecida por la Legislatura en cuanto a la revisión judicial de las resoluciones emitidas por la Policía de Puerto Rico. Hemos expresado que en la práctica casi todo es revisable por los tribunales y como resultado de esa postura, se ha favorecido la revisión judicial.
El Procurador General alega que por tratarse de una orden ejecutiva ésta no es revisable judicialmente por disposición de la L.P.A.U. Ante tal alegación, los peticionarios arguyen que la carta enviada por el entonces Gobernador al entonces Superintendente de la Policía no cumple con los requisitos de una orden ejecutiva al no tener estampado el sello oficial del Estado Libre Asociado de Puerto Rico (E.L.A.), así como por no publicarse de acuerdo con el procedimiento seguido por el Departamento de Estado.(14)
Si bien es cierto que el uso y costumbre cuando se emite una orden ejecutiva es ponerle el sello del E.L.A. y darle publicidad en el Departamento de Estado, no es me-nos cierto que hay un vacío estatutario en cuanto a los *138 requisitos que se deben cumplir al emitir una orden ejecutiva. Una orden ejecutiva no puede intervenir con derechos constitucionalmente protegidos. Sólo se permitiría tal acción en casos de extrema emergencia y por tiempo limitado.(15) Permitir tal actuación constituiría un abuso de poder por parte de la Rama Ejecutiva.(16) Además, tal abrogación de poder podría resultar inconstitucional por lesionar el sistema de pesos y contrapesos establecidos en la Constitución del Estado Libre Asociado de Puerto Rico.
Una orden ejecutiva encuentra su base legal en la obligación general del primer ejecutivo de cumplir y hacer cumplir las leyes, vigilar y supervisar la conducta oficial de todos los funcionarios y agencias del poder ejecutivo. Una orden ejecutiva es un mandato dirigido a uno de los brazos auxiliares del poder ejecutivo, conforme a nuestra Constitución y el ordenamiento jurídico estatutario. Pese a lo anterior, el poder del Gobernador para emitir órdenes ejecutivas no puede ejercerse de forma contraria o tener un efecto adverso a lo dispuesto por ley.(17) Una orden ejecutiva promulgada de acuerdo con la autoridad conferida al Gobernador, ya sea por la Constitución o por la Legislatura, tiene efecto de ley. No obstante, una orden ejecutiva promulgada en ausencia de autorización concedida por la Constitución o por estatuto no tiene efecto de ley.(18)

Es imprescindible mencionar que lo que hoy revisamos no es la llamada “orden ejecutiva” emitida por el entonces Gobernador, licenciado Acevedo Vilá, sino la Orden Núm. OS-1-16-330 promulgada por el entonces Superintendente de la Policía, licenciado Toledo Dávila. Ello se debe a que la referida orden adjudicó todas las reclamaciones presentadas por los peticionarios, licenciado Hernández Colón y el licenciado 
*139
Romero Barceló. De tal orden éstos recurrieron al Tribunal de Apelaciones mediante un recurso de revisión judicial de decisión administrativa y ante nos mediante recurso de “certiorari”.

La acción de la agencia administrativa intervino con un derecho adquirido y constitucionalmente protegido de los peticionarios, por ende, no reside dentro del poder discrecional del Superintendente de la Policía y ha de ser revisable judicialmente. Concluimos que la orden emitida por la Policía de Puerto Rico le puso fin al trámite administrativo. La llamada “Orden Ejecutiva” por el Procurador General no podía obviar e ignorar la interpretación de una legislación vigente por la agencia que la administra, avalada por la Legislatura, que produjo un derecho adquirido constitucionalmente protegido. El único recurso disponible de los peticionarios frente a la decisión del Superintendente de la Policía era acudir mediante revisión judicial ante el Tribunal de Apelaciones, como correctamente hicieron.

(-H hH
En el caso de marras, los peticionarios alegan que la PolicIa de Puerto Rico violentó su derecho a un debido proceso de ley por haber intervenido injusta e inequitativamente con un derecho adquirido por ellos. El debido proceso de ley aplica ante una privación de un derecho, ya sea propietario, de libertad o vida. El derecho a un debido proceso de ley surge por imperativo constitucionaL Tanto la Constitución del Estado Libre Asociado de Puerto Rico como la de Estados tinidos de America señalan, respectivamente, lo siguiente:
Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. ... Ninguna persona será privada de su libertad o propiedad sin *140 el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.(19)
No State shall make or enforce any law which shall... deprive a person of life, liberty, or property, without due process of the law. ...(20)
No obstante, en los procedimientos administrativos el debido proceso de ley es de carácter flexible. Por ello, existen excepciones que niegan el derecho de ser oído y ello no significa que no se haya cumplido con el debido proceso de ley.
Desde principios del siglo veinte el Tribunal Supremo de Estados Unidos determinó que en los procesos de reglamentación se puede negar no solo el derecho de ser oído, sino también, el de presentar evidencia, argumentar y contrainterrogar. Ello, por razones que limitarían el buen funcionamiento y la razón de ser de la función reglamentadora de algunas agencias administrativas. Lo anterior, surge cuando el proceso de reglamentación se vería afectado por concederle el derecho de ser oído a todo interesado.(21) Por otro lado, el Alto Foro federal puntualizó que aún en los procedimientos de reglamentación existe un derecho a ser oído cuando el reglamento va a afectar a una sola persona o a un pequeño grupo. Ello, por no obstaculizar los procedimientos administrativos, sino que los favorece porque complementan el expediente administrativo y los procedimientos no se ven dilatados de forma perjudicial.(22)
Para determinar si se ha violentado el debido proceso de ley los tribunales deben auscultar si la persona que reclama tiene un derecho de libertad, propiedad o vida que se ve afectado, y si el procedimiento administrativo seguido por la agencia es un sustituto constitucionalmente *141 adecuado para cumplir con el debido proceso de ley, haciéndolo justo y equitativo.(23)
¿Violó la Policía de Puerto Rico el debido proceso de ley de los peticionarios al intervenir con su derecho propietario adquirido, constitucionalmente protegido? Por estar en controversia la existencia de un derecho propietario, constitucionalmente protegido, nos vemos forzados a contestar tal interrogante en la afirmativa. Veamos.
La decisión del entonces Superintendente de la Policía, licenciado Toledo Dávila, afectó a los peticionarios por existir la posibilidad de un daño real y patente a un derecho adquirido constitucionalmente, protegido en virtud del cese de sus funciones como gobernadores de Puerto Rico. Por ello, nos encontramos ante la situación de que los peticionarios sufrieran un daño real, claro y palpable sin haber tenido la oportunidad de disfrutar de su derecho a un debido proceso de ley.
IV
El Tribunal de Apelaciones entendió que el Art. 7 del Código Civil,(24) no aplica cuando hay una erogación de fondos públicos. Tal percepción es errónea. Hemos determinado que, “[e]n nuestra jurisdicción es aceptable la norma de que, bajo ciertas circunstancias apropiadas, un demandante pueda invocar contra el Estado la doctrina de los actos propios, impedimento en equidad y de la buena fe”.(25) Lo que sí hemos expresado es que no son aplicables tales principios cuando se realiza una erogación ilegítima de fondos públicos.(26) Concluimos que en el caso de marras *142 no se violentó ninguna disposición legal sobre desembolso de fondos públicos. Veamos.
Como señaláramos previamente, la protección mediante escoltas policiacas a los ex gobernadores surgió de la interpretación que la Policía de Puerto Rico le ha dado al Art. 3 de la Ley de la Policía, supra, el cual dispone, en la actualidad, lo siguiente:
Se créa en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará “Policía de Puerto Rico” y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir, investigar y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a estas se promulguen. Los miembros de la Policía estarán incluidos en el servicio de carrera.(27)
En el Derecho Administrativo la doctrina del “reenactment” se fundamenta en la creación de un estado de derecho que se sostiene sobre la validez impartida por la Legislatura a la interpretación dada a un estatuto por la agencia administrativa llamada a administrar su cumplimento. Se entiende que ocurre el “re-enactment” cuando la Asamblea Legislativa revisa y enmienda alguna ley pero deja intactas o no realiza cambios materiales en algunas de sus disposiciones, interpretadas por la agencia llamada a su cumplimiento. Avala la interpretación impartida a dicha disposición estatutaria por la agencia administrativa correspondiente. A base de ello, los tribunales deberán determinar que la decisión de la Asamblea Legislativa fue de preservar y validar la interpretación brindada por la agencia correspondiente a tal disposición, como parte del estado de derecho vigente.(28)
*143 Cuando la Legislatura enmienda una disposición estatutaria, conociendo la interpretación realizada por la agencia administrativa, y cambia el contenido de ésta de forma sustancial que afecta tal interpretación, los tribunales no pueden aplicar la doctrina del £íre-enactment”.(29) Cuando la Legislatura, con conocimiento de la interpretación que realiza una agencia administrativa sobre cierta disposición estatutaria llamada a interpretarla, enmienda el estatuto pero mantiene intacta la parte del estatuto interpretada por la agencia, entonces sí aplica la referida doctrinad.(30)
La doctrina del “re-enactment” puede ser invocada efectivamente frente al Gobierno cuando una agencia administrativa realiza una interpretación a una disposición estatutaria bajo su autoridad y la Legislatura, con conocimiento de ello, enmienda o revisa el estatuto y no realiza ningún cambio material a tal disposición.(31) En esa situación la agencia administrativa se ve impedida posteriormente de cambiar su propia interpretación.(32) El “reenactment” no solo permite que los tribunales avalen la interpretación administrativa concedida, sino que limita la discreción de la agencia administrativa para cambiar su interpretación luego de que el estatuto es revisado judicialmente.
La doctrina del “re-enactment” no puede invocarse exitosamente cuando la Legislatura enmienda un estatuto y deja intacta o sin cambio sustancial una disposición estatutaria pero no conoce la interpretación brindada a tal *144 disposición por el ente administrativo correspondiente. Para invocar la doctrina exitosamente contra el Gobierno se tiene que evidenciar ante el tribunal el conocimiento legislativo de la interpretación de la agencia correspondiente a tal disposición de ley. El Tribunal Supremo de Estados Unidos concluyó sobre este asunto de igual forma.(33)
La aplicación de la doctrina de “re-enactment” exige de los tribunales deferencia a la interpretación de la agencia administrativa según las circunstancias antes descritas. Se sostiene sobre la voluntad e intención del legislador.(34) Lo anterior, es compatible con nuestras reiteradas expresiones sobre la deferencia judicial hacia las determinaciones administrativas y legislativas.(35)
En Román v. Superintendente de la Policía, 93 D.P.R. 685, 690 (1966), expresamos lo siguiente:
Asumiendo que estuviéramos ante un estatuto de dudoso texto que demandara interpretación, hay un punto adicional. Ha sido norma de derecho generalmente aceptada que la aplicación e interpretación administrativa de un estatuto por aquellos organismos particularmente encargados de ponerlo en vigor y velar porque sus fines se cumplan de ordinario debe merecerle un gran peso a los tribunales ....
Es significativo el hecho que con posterioridad al 1947 y durante tantos años que ha estado en vigor la See. 2 el Legislador ha legislado en relación a la Ley Núm. 469 y en momento alguno ha alterado o repudiado la interpretación administrativa de dicha disposición o la aplicación de la misma hecha por los organismos administrativos. Debe presumirse que ha sancionado dicha interpretación. (Enfasis suplido.)
Hemos reconocido que es un principio de hermenéutica que el legislador conoce la interpretación que este Tribunal ha hecho de las leyes. Cuando el legislador, cono *145 ciendo la existencia de una opinión de este Tribunal que interpreta un estatuto, enmienda parte de éste pero mantiene inalterado el texto interpretado por este Tribunal, se avala la normativa jurisprudencial sentada.(36) El Tribunal Supremo de Estados Unidos ha determinado que cuando el Congreso enmienda algún estatuto al cual una agencia administrativa le ha impartido una determinada interpretación a algunas de sus partes y el Congreso no intenta modificar esa parte del referido estatuto, la interpretación administrativa adquiere rango de norma vigente.(37)
En la jurisdicción federal se ha resuelto que cuando el Presidente de Estados Unidos veta un proyecto de ley, ello no limita o impide a los tribunales acudir al historial legislativo del proyecto para determinar la intención del Congreso sobre cierta disposición estatutaria que no iba a sufrir ningún cambio material.(38)
V
¿Poseen los ex gobernadores y peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, un derecho adquirido constitucionalmente protegido de seguridad mediante escoltas, o por el contrario, sólo poseían una mera expectativa de tal beneficio? Concluimos que estos poseen un derecho adquirido constitucionalmente protegido de seguridad mediante escoltas.
F. Gómez de Liaño, define el derecho adquirido como “[e]l que se encuentra definitivamente incorporado al patrimonio de una persona y que como regla general han de *146 ser respetados por las nuevas leyes”.(39) La contrapartida de los derechos adquiridos es la expectativa. La esperanza no constituye un derecho. Esta corresponde más a situaciones de hecho que a situaciones jurídicas. Es un interés que no posee ningún grado de protección jurídica. Es orna simple expectativa que no autoriza a la persona a realizar actos conservatorios, los cuales no pueden ser transmisibles y pueden ser obviados por una nueva legislación. En síntesis, los derechos adquiridos son las facultades legales regularmente ejercidas y las expectativas, aquellas facultades no ejercidas al momento del cambio de legislación.
Los derechos adquiridos son intangibles. Por ello, ni la Legislatura al promulgar una nueva ley, ni el Gobernador mediante una orden ejecutiva,, los puede lesionar o ignorar. No sucede lo mismo con las expectativas, pues estas son probabilidades o esperanzas que se tienen y, por ello, pueden modificarse razonablemente. Un derecho adquirido se incorpora dentro del patrimonio del titular del derecho y está protegido constitucionalmente frente a cualquier gestión gubernamental que pretenda intervenirlo.
El Art. 3 del Código Civil dispone que “[l]as leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario [y, e]n ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior”.(40) En Vázquez v. Morales, 114 D.P.R. 822 (1983), expresamos que el Art. 3 del Código Civil está básicamente inspirado en la doctrina de los derechos adquiridos, sin descartar los hechos consumados.
Es imperativo mencionar que los derechos adquiridos, sin importar su procedencia, ya sea mediante legislación, por contrato o por “derecho común” gozan de la misma *147 protección que todo derecho constitucional.(41) Recientemente expresamos que los derechos adquiridos protegidos pueden concebirse como “consecuencia de un hecho idóneo, al producirlos en virtud de una ley vigente en el tiempo en que el hecho ha sido realizado, y que se han incorporado a una persona".(42) Expresamos, además, lo siguiente:
En este sentido, el derecho adquirido no puede ser el conjunto de facultades que la ley anterior permitía que los ciudadanos ejerciesen, ya que esto sería el estado de derecho objetivo que la nueva ley intenta cambiar. El derecho adquirido, en cambio, es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior. Así, los tratadistas distinguen entre la mera expectativa del derecho y los derechos adquiridos que ya entraron en el patrimonio de los sujetos involucrados. (Enfasis suplido.)(43)
La agencia administrativa tiene la obligacion de salvaguardar cualquier derecho adquirido que haya sido reconocido por ésta, al hacer cumplir la ley que administra. La importancia de la teorla de los derechos adquiridos tiene que verprincipalmente con la aplicación del estado de derecho vigente en el tiempo, pero también con la seguridad jurIdica de las personas naturales ojurIdicas frente al ejercicio de las potestades unilaterales del Gobierno.
Cuando una agencia administrativa crea o modifica una relación jurIdica existente de carácter particular y concreto o reconoce un derecho de igua~ categoria, éste no podrá ser revocado sin el consentimiento expreso y preferiblemente escrito del respectivo titular. En suma, se per-mite la renuncia de un derecho adquirido como se permite la renuncia de cualquier otro derecho siempre que la renuncia sea consciente, informada, voluntaria y libre de coacción.
*148 AI poseerse un derecho adquirido protegido constitucionalmente la aplicación de una orden ejecutiva o un estatuto, en determinados casos, no puede aplicarse retroactivamente. Este Tribunal ha sido consecuente en reconocer su aplicación prospectiva debido a que no se pueden ver afectados los derechos adquiridos protegidos con anterioridad al cambio propuesto.(44)
Los aquí peticionarios no poseían una mera expectativa sobre el derecho de protección, sino que éstos poseen un derecho adquirido en virtud de sus respectivos retiros como primeros ejecutivos del país, al amparo de un estado de derecho específico. Es pertinente destacar que el Superintendente de la Policía en una vista pública ante la Asamblea Legislativa expresó en su ponencia lo siguiente: “estos ex funcionarios tienen unos derechos adquiridos, es necesario que esta pieza legislativa se atempere y contenga disposiciones similares a la Ley Federal para que establezca que el beneficio de la escolta limitada a un término fijo de tiempo será aplicable al próximo gobernador electo.”(45)
La ley federal dispone, en parte, lo siguiente:
(a) Under the direction of the Secretary of the Treasury, the United States Secret Service is authorized to protect the following persons:
(1) The President, the Vice-President (or other officer next in the order of successions to the Office of President), the President-elect, and the Vice President-elect.
(2) The immediate families of those individuals listed in paragraph (1).
(3) Former Presidents and their spouses for their lifetimes, except that protection of a spouse shall terminate in the event of remarriage unless the former President did not serve as President prior to January 1, 1997, in which case, former Presidents and their spouses for a period of not more than ten years from the date a former President leaves office ....(46)
Como puede apreciarse en la jurisdicción federal se les *149 reconoció un derecho de protección y seguridad mediante escoltas de manera vitalicia a los ex presidentes que cesaron funciones antes del 1 de enero de 1997. Los salientes presidentes, electos luego de la referida fecha, sólo obtendrán el derecho de protección durante un término no mayor de diez años. El Congreso de Estados Unidos reconoció que la legislación promulgada por estos tenía que tener carácter prospectivo debido a que los ex presidentes para la fecha de aprobación del referido estatuto poseían un derecho adquirido ilimitado sobre protección mediante escoltas provistas por el Servicio Secreto de Estados Unidos.
VI
El Superintendente de la Policía expresamente reconoció que los aquí peticionarios tienen un derecho adquirido protegido, el cual no puede verse afectado por una aplicación retroactiva de una orden ejecutiva. El entonces Superintendente, licenciado Toledo Dávila, igualmente, reconoció que el gasto por el uso de escoltas era mínimo y su eliminación no representaría una economía significativa en las arcas públicas.(47)
La protección policiaca a los ex gobernadores ha sido plasmada y reforzada por numerosas acciones legislativas. Estas acciones datan desde el 1956 como resultado de la interpretación del Art. 3 de la Ley de la Policía, supra. Tal interpretación fue realizada durante el curso de muchos años por la Policía de Puerto Rico y avalada por la Legislatura de Puerto Rico. La Orden General Núm. 77-2 emitida el 15 de abril de 1977 por el entonces Superintendente de la Policía, Sr. Roberto Torres González, reconoció expresamente el derecho a la seguridad y protección mediante escoltas policiacas a los ex gobernadores. En dicha orden, el entonces Superintendente de la Policía uniformó el de *150 recho a las escoltas estableciendo las normas y procedimientos aplicables a éstas. Tal acción tuvo el efecto de reactivar la interpretación impartida por la agencia al Art. 3 de la Ley de la Policía, supra, reconociendo el derecho de protección de los ex gobernadores mediante el uso de las escoltas policiacas.
El 22 de diciembre de 1992, se emitió la Orden General Núm. 88-6, en donde la Policía de Puerto Rico nuevamente tomó acción en relación con las escoltas de los ex gobernadores. La referida Orden General enmendó la Núm. 77-2, regulando el derecho de los ex gobernadores a recibir protección mediante escoltas policiacas. La Orden General Núm. 88-6 expresamente reconoció que la Policía de Puerto Rico tiene la obligación de proveerles protección y seguridad a los ex gobernadores de Puerto Rico. Tal or-den, al igual que la anterior, señaló como base legal al Art. 3 de la Ley de la Policía, supra, para otorgar la protección mediante escoltas policiacas a los ex gobernadores de Puerto Rico. La Orden General Núm. 88-6, en nada alteró el carácter vitalicio del derecho al uso de escoltas policiacas en beneficio de la seguridad de los ex gobernadores.
Para el 1 de septiembre de 1998 el entonces Superintendente de la Policía aprobó la Orden General Núm. 98-13, la cual estableció las “Normas y Procedimientos para los Servicios de Protección y Seguridad del Gobernador y ex Gobernadores de Puerto Rico; al Superintendente de la Policía de Puerto Rico y otros Funcionarios, Jefes de Estado y Primeros Ministros de otros Países”. Tal orden no establece discreción administrativa alguna, ni el límite de tiempo en que se concederá la protección a los referidos funcionarios. La orden básicamente se limita a establecer la estructura orgánica y el personal encargado de proveer el servicio de protección y seguridad a los ex gobernadores.
Luego, el 7 de enero de 2004 el Superintendente de la Policía aprobó la Orden General Núm. 2003-9. La referida Orden derogó la Núm. 98-13 y creó la Oficina de Seguridad *151 y Protección. Bajo esta Oficina se ubicó la protección y seguridad de los gobernadores y ex gobernadores. Dicha oficina responde directamente al Superintendente de la Policía. Nuevamente, la referida orden general no estableció el límite de tiempo para la protección mediante escoltas a los ex gobernadores, así como tampoco pautó discreción alguna del Superintendente de la Policía sobre la protección y seguridad de estos ex funcionarios.
La Ley de la Policía de 1996 derogó la Ley de 1974.(48) Tal derogación no cambió la redacción del Art. 3, supra, fuente de donde emana el derecho y el deber de la Policía de ofrecer seguridad mediante escoltas a los ex gobernadores. La Legislatura de Puerto Rico tenía pleno conocimiento sobre la interpretación que se le había brindado históricamente al Art. 3 de dicha Ley, supra, y que tal práctica se llevaba a cabo desde el 1965.
La Legislatura durante más de cuarenta años no ha efectuado ningún tipo de enmienda, eliminación o alteración al Art. 3 de la Ley de la Policía, supra, que afectara el derecho adquirido de los ex gobernadores incluyendo a los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló. Lo que es más, en cuarenta y una ocasiones la Legislatura de Puerto Rico aprobó el presupuesto anual del gobierno, según dispone nuestra Constitución, y en todos ellos aprobó una partida para sufragar la protección a los ex gobernadores mediante el uso de las escoltas policiacas. La Asamblea Legislativa de Puerto Rico reconoció que la seguridad de los ex gobernadores de Puerto Rico es un asunto de alto interés público.
Hay que mencionar que la Ley de la Policía tuvo una enmienda el 1 de junio de 1996. La enmienda fue en el Art. 30, el cual dispone lo siguiente:
(a) La Policía de Puerto Rico tendrá la responsabilidad de *152 proveer seguridad y protección al Gobernador de Puerto Rico y a su familia.
(b) Además, tendrá la responsabilidad de proveer seguridad y protección al Superintendente y a su familia, durante el término de su incumbencia. Dicho servicio continuará, una vez éste cese en sus funciones por cuatro (4) años adicionales y podrá ser extendido previa solicitud y aprobación del Superintendente que lo sustituya. (Énfasis suplido.)(49)
El legislador estableció la protección mediante escoltas a los ex superintendentes de la Policía. De igual manera, incluyó el procedimiento para solicitar una extensión a esa protección, siempre y cuando, demuestre justa causa y el Superintendente de turno se lo conceda. Si el legislador hubiera tenido la intención de eliminar la protección de las escoltas a los ex gobernadores lo habría incluido, lo que no ocurrió. La Asamblea Legislativa no entendió necesario limitarlo, así como tampoco incluirlo porque conocía y avaló la referida interpretación del Art. 3 de la misma ley, supra. Se limitó a expresar que el derecho de escoltas se posee dentro de la jurisdicción territorial de Puerto Rico.
En la jurisdicción federal se ha resuelto que en situaciones como la de autos se puede acudir al historial legislativo sobre proyectos de ley aunque éstos hayan sido vetados por el Presidente.(50) En el caso ante nos, el historial legislativo del Proyecto del Senado 121 evidencia con más peso del necesario que la intención legislativa al promulgar las leyes de la Policía en el 1974 y 1996, supra, fue de continuar brindándole protección y seguridad mediante el uso de escoltas policiacas a los ex gobernadores. Como, mencionamos anteriormente, el Proyecto fue vetado por el entonces Gobernador, licenciado Acevedo Vilá, pero del historial legislativo se desprende, claramente, la deferencia a la interpretación de la agencia al Art. 3 de la Ley de la Policía, supra, de parte de la Asamblea Legislativa.

*153
Por lo expuesto, nos es forzoso concluir que la Legislatura de Puerto Rico reconoció el derecho de los peticionarios a recibir el servicio de escoltas policiacas para garantizar su seguridad.

Concluimos que la doctrina del “re-enactment” es aplicable a la presente controversia. Se le solicitó a la Legislatura de Puerto Rico revisar la práctica de proveerles seguridad mediante escoltas a los ex gobernadores cuando ésta consideró y enmendó la Ley de la Policía en el 1996 y volvió a avalar el Art. 3, supra, sin alterarlo de forma tal que afectara la interpretación que la Policía de Puerto Rico había realizado hasta ese momento sobre tal disposición estatutaria.(51)
Nos encontramos frente a un cuadro fáctico que permite la aplicación de la doctrina del “re-enactment”; el conocimiento legislativo sobre la protección y seguridad de los ex gobernadores de parte de la Policía de Puerto Rico mediante escoltas al promulgar las leyes de la Policía de 1974 y 1996; que tal protección fue concedida mediante la interpretación que realizó el Departamento de Policía del Art. 3 de la Ley de la Policía de 1956, supra; y que ésta ha sido avalada por el referido Poder Legislativo consecuentemente durante más de cuatro décadas.(52)
El Tribunal de Apelaciones entendió que no existe derecho de escoltas para la protección y seguridad de los ex gobernadores. Acudió a la Ley Núm. 2 de 26 de marzo de *154 1965.(53) El que este estatuto no dispusiera expresamente sobre el servicio de protección y seguridad mediante escoltas para los ex gobernadores no es razón para creer que la intención legislativa fue rechazar tal servicio ofrecido por la Policía de Puerto Rico. Cuando se aprobó la Ley Núm. 2 el ex Gobernador de Puerto Rico, señor Muñoz Marín, ya disfrutaba de tal derecho. No existía una necesidad de legislar para proveer protección y seguridad a los ex gobernadores. La Legislatura avaló por espacio de cuatro décadas lo actuado por la Policía de Puerto Rico sobre tal asunto.
La doctrina del “re-enactment” es compatible con nuestras expresiones en Román v. Superintendente de la Policía, supra. Por ello y por todo lo expuesto, la referida doctrina aplica al presente caso.
Nada de lo aquí pautado limita el poder de la Legislatura de Puerto Rico para regular el referido derecho protegido o eliminar el derecho de seguridad y protección de los futuros ex gobernadores de manera prospectiva. De igual forma, cualquier ex gobernador que entienda que la protección brindada mediante escoltas le es innecesaria puede renunciar voluntaria y expresamente a tal derecho.
Finalmente, por encontramos ante un asunto normativo y de alto interés público, aprovechamos la ocasión para distinguir la presente controversia de lo pautado en Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408 (2009). En el presente caso, al igual que en Suárez Cáceres v. Com. Estatal Elecciones, 176 D.P.R. 31 (2009), tenemos toda la controversia ante nos, tanto sustantiva como procesal. Por ello, al resolver la controversia de marras y disponer lo que en Derecho procede, no alteramos en forma alguna la normativa establecida por este Tribunal en Crespo Quiñones v. Santiago Velázquez, supra. En éste la controversia trataba sobre un asunto estrictamente procesal de carácter jurisdiccional, a diferencia del presente *155 recurso, el cual trata sobre cuestiones procesales así como sustantivas. En Crespo Quiñones v. Santiago Velázquez, supra, el Tribunal de Apelaciones se limitó a reseñar la falta de jurisdicción por cuestiones procesales.(54) En el caso ante nos no ocurrió lo mismo. A pesar de que el foro apelativo intermedio dictaminó en su sentencia que no tenía jurisdicción para resolver el asunto, entró a discutir los méritos del recurso, tanto sustantivos como procesales y el expediente del caso por estar completo nos permite resolver la controversia, a diferencia de lo ocurrido en Crespo Quiñones v. Santiago Velázquez, supra.(55)
Como hemos expresado previamente, este Tribunal entiende que el Tribunal de Apelaciones tenía jurisdicción en la presente controversia. No obstante, las partes nos han puesto en posición de resolver el asunto planteado a dife *156 rencia del caso Crespo Quiñones v. Santiago Velázquez, supra.(56)
No existe duda alguna que en Crespo Quiñones v. Santiago Velázquez, supra, la controversia estaba revestida de un alto interés público, como lo es el bienestar de los menores de edad. A diferencia de la presente controversia, en Crespo Quiñones v. Santiago Velázquez, supra, no nos encontrábamos en condiciones de pautar norma. Es conocido dentro de nuestro ordenamiento jurídico que en controversias donde estén involucrados menores de edad los tribunales de justicia deben de procurar salvaguardar los mejores intereses de éstos. La referida norma fue pautada hace décadas y tiene un fuerte arraigo dentro de nuestro sistema de justicia. La normativa hoy pautada no atenta, en forma alguna contra los intereses de los menores.
VII
Por todo lo expuesto, revocamos la sentencia emitida por el Tribunal de Apelaciones. Concluimos que la actuación del entonces Superintendente de la Policía no era discrecional. Ello es así porque afecta directa y sustancialmente un derecho adquirido que se encontraba ya en el patrimonio de los peticionarios y, por ende, protegido por nuestro ordenamiento jurídico constitucional.

Se dictara sentencia de conformidad.

*157 El Juez Asociado Señor Kolthoff Caraballo emitió una opinión de conformidad. El Juez Presidente Señor Hernández Denton emitió una opinión disidente, a la cual se unió la Jueza Asociada Señora Fiol Matta. La Juez Asociada Señora Rodríguez Rodríguez se inhibió.
Opinión de conformidad emitida por el
Juez Asociado Señor Kolthoff Caraballo.
Endoso en su totalidad la opinión que emite la mayoría de este Tribunal en el día de hoy. Aun así, me veo precisado a emitir este conciso voto de conformidad porque discierno que el resultado que en este día arroja nuestra decisión satisface, además del derecho y la justicia, una necesidad que emana de nuestro sentido de responsabilidad ante la realidad que implica nuestra idiosincrasia como Pueblo.
Como en todo país realmente democrático, nuestros gobernantes, pasados y presentes, han sido o continúan siendo nuestros líderes políticos. Personas que, en mayor o menor grado, representan una ideología política o que son emblemáticos de alguno de los partidos que ostenta o ha ostentado una franquicia electoral. Aunque Puerto Rico, gracias a Dios, no es un Pueblo inmanentemente violento, la realidad es que sí somos un pueblo extremadamente apasionado en lo referente a nuestros ideales políticos o la política partidista. En muchas ocasiones tal pasión se excita o despabila, a favor o contra, en función de la mera mención, imagen o presencia de aquellos que son los líderes o iconos de las distintas fórmulas de estatus o facciones partidistas. Entre tales líderes, como ya mencioné, se encuentran principalmente nuestros pasados gobernantes.
Obviar esta realidad es negar lo innegable, desconocer nuestra idiosincrasia como Pueblo o, simplemente, no haber experimentado lo que es el ambiente en un año electo *158 ral en nuestra Isla, así como lo que han sido nuestras campañas o procesos políticos en los últimos cincuenta años. Y pensar que tal pasión, frustración o descontento por cualquier pasada actuación de nuestros ex gobernantes, no sería capaz de manifestarse en la forma de una agresión física por parte de cualquier paisano, sería sin duda confundir lo poco probable con lo imposible.
Ahora bien, ante la realidad de un Pueblo no violento como el nuestro, ciertamente cabe pensar que es poco probable que ocurra un atentado contra la vida o la seguridad de alguno de nuestros ex gobernadores o la ex gobernadora. Pero, entonces, cabe también preguntarnos: ¿si se realizaran hoy los mismos análisis periciales que se realizaron en el año 1965 y que reflejaron la necesidad de escolta para el ex gobernador Luis Muñoz Marín, éstos reflejarían que hay menos probabilidad de que en la actualidad uno de nuestros ex gobernantes sufra un atentado contra su vida o su seguridad?
No sabemos con certeza la contestación a tal interrogante.(1) Sin embargo, los que vivimos en el Puerto Rico de hoy, juzguemos si la atmósfera política y la forma en que socializamos es menos violenta que la que vivimos o vivieron nuestros padres en la década de los años sesenta. Mas, si así fuera, si concluyéramos que un atentado criminal contra la vida de uno de nuestros ex gobernantes es hoy menos probable, tal premisa, de por sí, admite de todos modos la variable de lo posible.
Lo posible, según lo define el diccionario de la Real Academia Española, es algo “que puede suceder, que se puede ejecutar”.(2) De manera que, según definimos los conceptos, un atentado contra la vida o la seguridad de uno de nuestros ex gobernantes “puede suceder”, “se puede *159 ejecutar”. Entonces la pregunta que huelga es: ¿debemos aspirar a reducir tal riesgo? Y más aún, ¿entendemos las consecuencias que acarrea para la psiquis colectiva de nuestro Pueblo la pérdida violenta, a causa de un atentado criminal, de cualquiera de nuestros ex gobernantes?
Como señala la opinión mayoritaria, nuestras Asambleas Legislativas han reconocido que la seguridad de los ex gobernadores de Puerto Rico es un asunto de alto interés público, aprobando una partida para sufragar la protección de éstos, en cada presupuesto, por más de cuarenta años. Por otro lado y como también señala la opinión mayoritaria, el pasado Superintendente de la Policía, Ledo. Pedro Toledo Dávila, reconoció que el gasto por el uso de escoltas era mínimo y su eliminación no representaría una economía significativa en las arcas públicas.
La realidad del gasto relativamente mínimo al erario que presupone el mantenimiento de esas escoltas, vis-á-vis la reducción del riesgo de posibles daños a la persona de uno de estos líderes, nos debe guiar a preguntarnos, sin hesitación alguna: ¿vale la pena el gasto? O, visto de otra forma y ante lo mucho que está en riesgo: ¿tenemos realmente otra opción? Me parece que no.

 25 L.P.R.A. sec. 221b (ed. 1964).

 25 L.P.R.A. sec. 3102.

 25 L.P.R.A. sec. 1003 (ed. 1979).

 En la actualidad el Art. 3 de la Ley de Policía, supra, dispone lo siguiente:
“Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará ‘Policía de Puerto Rico’ y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir, investigar y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a estas se promulguen. Los miembros de la Policía estarán incluidos en el servicio de carrera.”

 3 L.P.R.A. sec. 2102(f).

 El Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico paralizó el procedimiento ante su consideración hasta que este Tribunal se expresara.

 Pagán v. Alcalde Mun. de Cataño, 143 D.P.R. 314 (1997); Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991); López Rivera v. Autoridad Fuentes Fluviales, 89 D.P.R. 414 (1963).

 3 L.P.R.A. sec. 2152.

 Constructora Celta, Inc. v. A.P., 155 D.P.R. 820 (2001); Rivera Ortiz v. Mun. de Guaynabo, 141 D.P.R. 257 (1996).

 3 L.P.R.A. sec. 2172.

 Depto. Educ. v. Sindicato Puertorriqueño, 168 D.P.R. 527 (2006).

 íd.

 Rivera v. Dir. Adm. Trib., 144 D.P.R. 808 (1998).

 Por los argumentos que expondremos a continuación no es necesario adentrarnos en el análisis sobre si la misiva enviada por el entonces Gobernador, licenciado Acevedo Vi,lá, al entonces Superintendente de la Policía, licenciado Toledo Dávila, cumple con los requisitos requeridos en una orden ejecutiva.

 3 L.P.R.A. secs. 1940-1942.

 Otero de Ramos v. Srio. de Hacienda, 156 D.P.R. 876 (2002).

 íd.

 Op. Sec. Just. Núm. 1985-5 de 27 de febrero de 1985.

 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2009, pág. 296.

 U.S.C.A. Const. Amend. XIV, Sec. 1.

 Bi-Metallic Co. v. Colorado, 239 U.S. 441 (1915).

 United States v. Florida East Coast R. Co., 410 U.S. 224 (1973).

 U. Ind. Emp. A.E.P. v. A.E.P., 146 D.P.R. 611 (1998); Rivera Rodríguez Co. v. Lee Stowell, etc., 133 D.P.R. 881 (1993).

 31 L.P.R.A. sec. 7.

 Berríos v. U.P.R., 116 D.P.R. 88, 98 (1985).

 Sepúlveda v. Depto. de Salud, 145 D.P.R. 560 (1998); Hatton v. Mun. de Ponce, 134 D.P.R. 1001 (1994).

 La palabra en bastardilla fue el único cambio realizado por la Legislatura al Art. 3 de la Ley de la Policía de 1996, supra.

 Lorillard v. Pons, 434 U.S. 575 (1978).

 Véanse: Solid Waste Agency of Nothern Cook Cty. v. Army Corps of Engineers, 531 U.S. 159, 169-170 (2001); United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 137 (1985); Aaron v. SEC, 446 U.S. 680, 694 esc. 11 (1980).

 Véase escs. 28-29.

 Wieslander v. Iowa Dept. of Transportation, 596 N.W.2d 516 (Iowa 1999); Commissioner v. Acker, 361 U.S. 87, 93 (1959); Bear Lake Irrigation Co. v. Garland, 164 U.S. 1 (1896).

 Véase Bell Federal Sav. and Loan Ass’n v. C.I.R., 40 F.3d 224, 229 (7mo Cir. 1994).

 Véase escs. 28-29.

 Alonso García v. S.L.G., 155 D.P.R. 91 (2001); Martínez v. Ofic. del Gobernador, 152 D.P.R. 586 (2000); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530 (1999).

6) Vélez v. A.R.Pe., 167 D.P.R. 684 (2006); Martínez v. Rosado, 165 D.P.R. 582 (2005); Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908 (1998).

 Mun. Trujillo Alto v. Cable TV, 132 D.P.R. 1008, 1021 (1993).

 Hartley v. Commissioner, 295 U.S. 216 (1935); Brewster v. Gage, 280 U.S. 327 (1930). Para más información sobre la doctrina de “re-enactment”, véanse: Barnhart v. Walton, 535 U.S. 212 (2002); Young v. Community Nutrition Institute, 476 U.S. 974 (1986); Labor Board v. Gullet Gin Co., 340 U.S. 361 (1951).

 Véase Clifton v. Heckler, 755 F.2d. 1138 (5to Cir. 1985); Feldpaush v. Heckler, 763 F.2d. 229, 233 (6to Cir. 1985) (en donde el Tribunal expresó lo siguiente: “Regardless of the President’s veto ... we find its legislative history instructive”).

 p Gómez de Liaño, Diccionario Jurídico, Salamanca, Gráficas Cervantes, 1979, pág. 113.

 31 L.P.R.A. sec. 3.

 16B Am. Jur. 2d. Sees. 670-720.

 Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101 (2006).

 Id., citando a M. Albaladejo, Derecho Civil, lima ed., Barcelona, Ed. Bosch, 1989, T. I, Vol. 1, pág. 204.

 Véase esc. 43.

 Cámara de Representantes, Segundo Informe Positivo sobre el P. del S. 121.

 18 U.S.C.A. sec. 3056.

 Véase esc. 46.

 Véase escs. 2-3.

 25 L.P.R.A. sec. 3129.

 Véase esc. 38.

 El entonces Senador, Sr. Miguel Hernández Agosto, en la discusión del Proyecto para la Ley de Policía de 1996, expresó su intención de discutir la partida de fondos previsiblemente necesaria para proveer el servicio de seguridad y protección policiaca. Aunque su petición no fue avalada ni discutida, sus expresiones, nuevamente, ponen de manifiesto que la Legislatura ha tenido y tiene el conocimiento de la práctica del Departamento de Policía de proveerle escoltas a los ex gobernadores a base de su interpretación al Art. 3 de la referida ley, supra.

 Este Tribunal no pretende, de forma alguna, limitar el poder discrecional del Superintendente de la Policía respecto a la cantidad de efectivos asignados como escoltas a los ex gobernadores, sin considerar la situación presupuestaria que vive el país. Su limitación reside en no desnaturalizar el derecho de seguridad y protección que los ex gobernadores adquirieron a base de la interpretación del Art. 3 de la Ley de la Policía, supra, que realizó la Policía y que fue avalada por la Legislatura y hoy reconocido por este Tribunal.

 3 L.P.R.A. sec. 21 et seq.

 En Crespo Quiñones v. Santiago Velázquez, supra, determinamos que el Tribunal de Apelaciones sí tenía jurisdicción para atender la controversia. Por ello, lo procedente era devolverlo al referido foro judicial para que entrara a resolver los méritos de la controversia entre las partes. Enfatizamos y destacamos que en aquella ocasión el único asunto que la señora Santiago presentó en su recurso se limitó a solicitar la revisión de la determinación del Tribunal de Apelaciones en la cual se desestimó el recurso de apelación por falta de jurisdicción. Lo anterior ha sido el proceder de este Tribunal en situaciones análogas. Véanse: Fraya v. A.C.T., 162 D.P.R. 182 (2004); Pellot v. Avon, 160 D.P.R. 125 (2003); Román et als. v. Román et als., 158 D.P.R. 163 (2002); Martínez v. Depto. del Trabajo, 145 D.P.R. 588 (1988). En Crespo Quiñones v. Santiago Velázquez, supra, puntualizamos que la situación es distinta cuando toda la controversia está ante nos y las partes la han argumentado.

 En Crespo Quiñones v. Santiago Velázquez, supra, el Tribunal de Apelaciones no discutió los méritos de la controversia de desahucio porque desestimó el recurso ante la ausencia de un requisito de umbral, la fianza, y lo que es más, las partes no argumentaron los méritos de la demanda de desahucio. Por ello, expresamos lo siguiente:
“[E]l único asunto que la señora Santiago Velázquez presentó en este recurso se limita a revisar la determinación del foro apelativo en la que se desestimó el recurso de apelación por falta de jurisdicción. Según surge del expediente, los escritos de las partes se circunscriben a discutir únicamente el asunto jurisdiccional. ...
“[N]uestra decisión de hoy es totalmente compatible con lo resuelto en Suárez Cáceres v. Com. Estatal de Elecciones .... Allí teníamos ante nos toda la controversia y la resolvimos luego de que las partes la argumentaran. En cambio, en el recurso que ahora nos ocupa ... no está ante nos y las partes no han argumentado los méritos de ninguna de las ... acciones ....” íd., págs. 418-419.
Contrario a Crespo Quiñones v. Santiago Velázquez, supra, en el caso ante nos, tanto el Tribunal de Apelaciones como las partes sí argumentaron los méritos de umbral de la controversia de marras.

 gn sumaj en Crespo Quiñones v. Santiago Velázquez, supra, devolvimos el caso al Tribunal de Apelaciones por entender que el referido foro tenía jurisdicción. En esa ocasión no entramos a resolver los méritos del caso, ello, debido a que la totalidad de la controversia no estaba ante nos y las partes no argumentaron los méritos de la acción. Solamente se limitaron a reseñar la jurisdicción del Tribunal de Apelaciones. Por ello, aclaramos que en situaciones como la de autos, donde la controversia ante nos está completa, sustantiva y procesalmente, y las partes la han argumentado, el curso a seguir es distinto a lo resuelto en Crespo Quiñones v. Santiago Velázquez, supra. Esto no equivale a un dictamen sin jurisdicción, sino el reconocer nuestra facultad de resolver una controversia que está madura y completa ante este Tribunal.

 Y como bien señala la opinión mayoritaria, aparentemente tal base de datos empíricos tampoco se tuvo al tomar la decisión de eliminar las escoltas en cuestión.

 Diccionario de la Lengua Española, Real Academia Española, 22da ed., Madrid, Ed. Espasa-Calpe, T. II, pág. 1810.